1999 UT 57

STATE of Utah, Plaintiff and Appellee,

v.

Michael Scott DECORSO, Defendant and Appellant.

No. 960512.

Supreme Court of Utah.

June 4, 1999.

Jan Graham, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., B. Kent Morgan, Salt Lake City, for plaintiff.

Joan C. Watt, Salt Lake City, for defendant.

HOWE, Chief Justice:

¶1   Michael Scott Decorso appeals from his conviction for aggravated murder, a capital offense, in violation of Utah Code Ann. § 76–5–202.

## FACTS

¶2   Shortly after closing time on February 15, 1994, the Payless Shoesource store in West Jordan, Utah, was robbed, and Margaret Ann Martinez, a fifty-year-old clerk of that store, was murdered.  When the store closed, the killer apparently remained inside posing as a customer.  Mrs. Martinez had locked the front door before ringing up the killer's purported purchase of a pair of size ten and a half "Honcho" brand work boots and a pair of size ten tennis shoes.  Evidently, after she opened the cash register drawer, the killer robbed her and later murdered her in a back room.  He ultimately took the "Honcho" work boots, the white tennis shoes, and $849.73 in cash.

¶3   Mr. Martinez, the victim's husband, became worried when his wife did not return home from work that night and began calling the store.  At about 10:40 p.m., he decided that something must be wrong and drove to the store.  Upon his arrival, he discovered that the glass in the front door had been shattered, with the majority of the broken glass lying outside the store, that the door was still locked, that the store was in disarray, and that the cash register drawer was empty.  Fearing something had happened to his wife, he called 911.

¶4   The police discovered Martinez's partially clothed body lying in a back room of the store.  Her face and head were bound with duct tape, and she had been stabbed multiple times in her neck and her breasts.  During the autopsy, the coroner discovered that her upper denture had been fractured into four pieces and that her nose also had been broken.  These injuries suggested that the killer struck her one or more times with "a heavy metal object, such as a gun."  Martinez died of asphyxiation, due primarily to the mask of duct tape wrapped around her face and head.

¶ 5 The killer had also bound her ankles together with duct tape and had bound her wrists with a telephone cord. Detectives found a latent fingerprint on a piece of duct tape attached to her pant leg. Her shirt, pants, and panties had been cut off of her body in a manner consistent with that commonly used by an emergency medical technician ("EMT").[1] Her brassiere had been unhooked in the back and pulled down, exposing her breasts. A pair of blood-stained scissors was found lying next to her body.

¶ 6 The killer had written the letters "TSG" on the wall in the victim's blood. The evidence suggested that these letters possibly stood for either the "Tongan Style Gangsters" or "Tai Style Gangsters." State experts later opined that the killer had worn surgical or similar-type gloves when he wrote on the wall and that there was a slight correlation between the writing on the wall and defendant Decorso's handwriting.

¶ 7 On September 17, 1994, a lone gunman, later identified as Decorso, confronted two store clerks at the Payless Shoesource store located in Draper, Utah, shortly after closing time and attempted to rob them. He had entered the store sometime earlier posing as a customer. He then apparently hid himself until after the store closed and the doors locked. At that point, he attempted to rob the two store clerks. However, when one of the clerks, Sundee Fagg, escaped out the front door and sought help, the gunman fled, leaving behind the money. At a police lineup several months later, Fagg positively identified Decorso as the perpetrator of that burglary.

¶ 8 The perpetrator of the Draper Payless burglary left behind a black fanny pack which contained a flashlight, a pair of rubber gloves, a Swiss Army knife, two fully loaded clips for an automatic handgun, a small rope, and a special forces medallion similar to one belonging to Decorso. He also left a bag containing three boxes of shoes in a back room of the store. Fingerprints were found on the knife and on one of the shoe boxes.

¶ 9 In March 1995, more than a year after Martinez's murder, Decorso's fingerprints were submitted to the state crime lab for comparison with the print left on the duct tape attached to Martinez's pant leg. The print from Decorso's left middle finger matched the fingerprint on the duct tape. His prints also matched those left on the Swiss Army knife and the shoe box found at the Draper Payless store. Thereafter, the State executed search warrants at his storage unit and his parents' home and seized several items of evidence, including rubber gloves, duct tape, and a mace can wrapped in duct tape.

¶ 10 The State charged Decorso with aggravated murder. Following the guilt phase of his jury trial, he was convicted as charged. At the penalty phase, the jury returned a verdict sentencing him to a term of life in prison without parole.

¶ 11 On appeal, Decorso contends that (1) the trial court erred in admitting evidence of other unadjudicated offenses allegedly committed by him at the Draper Payless store; (2) the court erroneously denied his motion for mistrial; (3) the court erred in refusing to suppress Sundee Fagg's identification of him at the police lineup; (4) the court erroneously admitted into evidence Martinez's bloody clothing and a photograph of her corpse; (5) the court failed to suppress evidence seized by police pursuant to two search warrants which were issued without probable cause; (6) the admission of a jailhouse informant's testimony violated Decorso's constitutional rights; (7) the cumulative effect of the trial errors requires reversal; and (8) during the penalty phase, the court erroneously admitted evidence of other unadjudicated offenses pending against Decorso.

## ANALYSIS

### I. ADMISSION OF OTHER CRIMES EVIDENCE UNDER RULE 404(b)

¶ 12 The first issue presented is whether the trial court erred in admitting evidence of

---

1. At the time of this murder, Decorso was employed by the Midvale City Fire Department as an EMT.

other crimes allegedly committed by Decorso at the Draper Payless store. The admission of evidence of other crimes, wrongs, and bad acts is governed by rule 404(b) of the Utah Rules of Evidence. This rule was amended to "abandon[ ] the additional requirements for admitting evidence under Rule 404(b) imposed by *State v. Doporto*, 935 P.2d 484 (Utah 1997)." Utah R. Evid. 404(b) advisory committee note. The rule currently provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *In other words, evidence offered under this rule is admissible if it is relevant for a noncharacter purpose and meets the requirements of Rules 402 and 403.*

Utah R. Evid. 404(b) (emphasis added). The 1998 amendment added the emphasized language above.

¶ 13 Although the language of the 1998 amendment does not clearly express that it was intended to abandon the 404(b) analysis adopted in *State v. Doporto*, 935 P.2d 484 (Utah 1997), the advisory committee note to the rule, as noted above, makes that intention clear. The advisory committee note states:

> This amendment [the 1998 amendment, effective February 11, 1998] abandons the additional requirements for admitting evidence under Rule 404(b) imposed by *State v. Doporto*, 935 P.2d 484 (Utah 1997). It clarifies that evidence of other crimes, wrongs, or acts, offered under 404(b), is admissible if it is relevant for a non-character purpose and meets the requirement of rules 402 or 403.
>
> Utah's existing Rule 404 is otherwise identical to Federal Rule of Evidence Rule 404 and the equivalent rule in most other states. This amendment to the rule is not intended to depart from the meaning and interpretation given to the equivalent rule in other jurisdictions, but to return to the

traditional application of Rule 404 prior to *Doporto*.

Utah R. Evid. 404(b) advisory committee note. In light of the foregoing amendment, this opinion addresses the standard of appellate review and the correct analysis of other crimes evidence under rule 404(b). To the extent the language in *Doporto* is inconsistent with the standards described in this opinion, it is disavowed.

¶ 14 We begin with a discussion of the appropriate standard of review. In *Doporto*, this court stated, "[W]e will examine a trial court's decision under Rule 404(b) with very limited deference, according it a relatively small degree of discretion." 935 P.2d at 489 (footnote omitted); *see also State v. Pearson*, 943 P.2d 1347, 1351 (Utah 1997) ("This court reviews evidentiary rulings on prior crime testimony with limited deference, reviewing closely the trial court's exercise of its discretion.").

¶ 15 In our view, the "very" limited deference standard adopted in *Doporto* has in fact proved too restrictive and requires modification. Furthermore, as noted above, the 1998 amendment makes clear that in addition to determining whether the other crimes evidence is being adduced for a proper noncharacter purpose, the court must also analyze this evidence under rules 402 and 403 of the Utah Rules of Evidence. Consequently, we must clarify the appropriate standard of review applicable to such rulings, especially since the standards applicable to 402 and 403 rulings vary considerably from the limited deference standard described in *Doporto*.

¶ 16 Although we could adopt a bifurcated standard of review, in which the trial court's analysis under rule 404(b) is afforded only limited deference while its analysis under 402 and 403 is reviewed for abuse of discretion, we think that such a standard would be too confusing. As Justice Stewart's opinion in *Doporto* pointed out, this court recognizes that, as to mixed questions of law and fact (like the decision to admit or reject prior crimes evidence), "the degree of discretion accorded a trial court could fall within a broad continuum from little or no discretion to broad discretion, depending on the nature of the policies underlying the governing law

and the occurrence of multitudinous factual variations giving rise to many highly subtle differences." 935 P.2d at 489 (citation omitted). Justice Stewart's plurality opinion went on to characterize the standard as one of "very limited deference, according [the trial court's decision under rule 404(b)] a relatively small degree of discretion." *Id.* (footnote omitted). Justice Zimmerman, in a separate opinion, wrote that he would characterize the standard of review as "abuse of discretion, as it is in other instances of the admission of evidence," 935 P.2d at 496, but acknowledged that in cases of "presumptively prejudicial" evidence, our jurisprudence has generally required that "in order to avoid the conclusion that the trial court abused its discretion, all 'i's must be dotted and all 't's crossed." *Id.* Justice Zimmerman's view was that the "very limited deference" articulation of the standard in Justice Stewart's opinion had the effect of diminishing the relative importance of the trial court's judgment and enhancing that of the appellate court:

> Under the *Dibello* line of cases, we make it clear that while as a matter of law, certain categories of evidence are presumptively unfairly prejudicial, the trial judge is the one primarily responsible for making the evaluation of whether the proponent of the evidence has overcome that presumption.

*Id.* (citing *State v. Dibello,* 780 P.2d 1221 (Utah 1989)).

¶ 17 Justice Zimmerman acknowledged that the standard as Justice Stewart articulated it "probably would not materially change how each of us would review a trial court decision to admit the evidence here," *id.,* and Justice Stewart observed in a footnote that "[i]t is difficult to see any practical difference between the two formulations," 935 P.2d at 489 n. 3, as they will function in operation.

■ ¶ 18 We now clarify that the "abuse of discretion" articulation of the standard of review is more straightforward under rule 404(b), as amended, and reaffirms that under our prior case law, admission of prior crimes evidence itself must be scrupulously exam-

ined by trial judges in the proper exercise of that discretion.[2]

¶ 19 Having clarified the appropriate standard of review, we now explain the proper analysis to be applied by the trial court in deciding whether to admit evidence of other crimes, wrongs, or bad acts under rule 404(b).

■ ¶ 20 As the amendment to rule 404(b) now makes clear, in deciding whether evidence of other crimes is admissible under rule 404(b), the trial court must determine (1) whether such evidence is being offered for a proper, noncharacter purpose under 404(b), (2) whether such evidence meets the requirements of rule 402, and (3) whether this evidence meets the requirements of rule 403.

¶ 21 Under the first part of this analysis, the proponent must demonstrate that the evidence is actually being offered for a proper, noncharacter purpose, such as those specifically listed in the rule. If the court resolves that it is, then it must proceed with the remainder of the analysis. However, if the court determines that the evidence is being offered only to show the defendant's propensity to commit crime, then it is inadmissible and must be excluded at that point.

■ ¶ 22 The second part of the analysis requires the court to determine whether the offered evidence meets the requirements of rule 402, which excludes all evidence that is not relevant. Rule 401 of the Utah Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any *fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.) Although our pre-*Doporto* case law did not refer to rule 402 expressly, it required that the other crimes evidence must have " 'a special relevance to a controverted issue and [must be] introduced for a purpose other than to show the defendant's predisposition to criminality.' " *State v. Featherson,* 781 P.2d 424, 426 (Utah 1989) (quoting *State v. Shickles,* 760 P.2d 291, 295 (Utah 1988) (citations omitted)). Our case law has also made it clear that

---

2. I.e., the "dotting of 'i's and crossing of 't's" as discussed in *Doporto.*

" '[e]vidence is not admitted merely because it shows a common plan, scheme, or manner of operation. Instead, evidence of a common plan, scheme, or manner of operation is admitted [only] where it tends to prove some fact *material* to the crime charged.' " *Id.* (emphasis added) (quoting *State v. Forsyth*, 641 P.2d 1172, 1176–77 (Utah 1982)). Thus we reaffirm that unless the other crimes evidence tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime—it is irrelevant and should be excluded by the court pursuant to rule 402.

¶ 23 Under the final part of the analysis, the court must determine whether the other crimes evidence meets the requirements of rule 403. That rule provides:

> Although relevant, evidence may be excluded if its *probative value is substantially outweighed by the danger of unfair prejudice,* confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Utah R. Evid. 403 (emphasis added). In *Doporto,* Justice Stewart's opinion described other crimes evidence as " 'having an unusual propensity to unfairly prejudice, inflame, or mislead the jury.' " 935 P.2d at 490 (quoting *Dibello,* 780 P.2d at 1229). Because of this determination, the opinion used the language that "evidence of other crimes is presumed to be inadmissible," *id.,* and required the proponent to demonstrate that "its special probativeness and the necessity for it outweigh its prejudicial effect." *Id.* We now clarify that this language is inaccurate in suggesting that prior crimes evidence is presumptively inadmissible.

■ ¶ 24 As set forth above, the advisory committee note to rule 404(b) explains that the 1998 amendment was intended "to return to the traditional application of rule 404 prior to *Doporto.*" Although our pre-*Doporto* case law recognized the danger of prejudice which may flow from the admission of other crimes evidence, we had not before stated that there was a presumption against the admission of such evidence. *See generally Featherson,* 781 P.2d at 426–27; *Shickles,* 760 P.2d at 295–96. Thus, under the traditional applica-

tion of 404(b), prior to *Doporto,* there was no presumption against the admission of other crimes evidence if it was being offered for a proper, noncharacter purpose. Moreover, we see no necessity to import such a presumption into rule 404(b). Although that rule is exclusionary with respect to other crimes evidence offered only to show the defendant's propensity to commit crime, it is an inclusionary rule with regard to other crimes evidence which is offered for a proper, noncharacter purpose. *See, e.g.,* 29 Am. Jur.2d *Evidence* § 404 (1989) (stating that federal courts regard corresponding Fed. R.Evid. 404(b) as a rule of inclusion). Therefore, we hold that if other crimes evidence is offered for a proper, noncharacter purpose, there is no presumption against admissibility.

■ ¶ 25 We also conclude that the 1998 amendment to the rule clarifies that the requirement described by the Stewart plurality opinion in that the proponent of the evidence must show that its special probativeness and the necessity for it outweigh its prejudicial effect—is unnecessary. A review of our pre-*Doporto* case law reveals that prior to that case, we had not required the proponent of other crimes evidence to make such a showing. *See generally Featherson,* 781 P.2d at 426–27; *Shickles,* 760 P.2d at 295. Moreover, this requirement contradicts the plain language of rule 403 which provides that relevant evidence may be excluded only if its potential for unfair prejudice substantially outweighs its probative value. Hence, we hold that other crimes evidence meets rule 403's requirements if its probative value is not *"substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403 (emphasis added).

¶ 26 Having clarified the proper analysis under rule 404(b), we now turn to the case at hand. However, before we apply the foregoing analysis to this case, we must still address Decorso's argument that the 1998 amendment cannot be applied retroactively to his case and that it must be reviewed under the analysis set forth in *Doporto,* 935

P.2d at 488–90. We disagree. *Doporto* was decided almost three months after Decorso's trial ended and thus is not controlling here. Instead, the 1998 amendment represents the pre-*Doporto* law that governs this case.

¶ 27 Applying this analysis to Decorso's case, we hold that the trial court did not abuse its discretion under rule 404(b) in admitting evidence of the Draper Payless burglary. First, the evidence was offered for a proper, noncharacter purpose—i.e., to establish the identity of Martinez's killer. Identity was the crux of this case. There were numerous similarities between the crimes committed at the West Jordan Payless and those committed at the Draper Payless, suggesting that the same person committed both crimes. For instance, the perpetrator of both crimes waited until after the stores had closed and the doors were locked to commit these crimes. He apparently entered both stores posing as a customer and then remained there until after closing. The victims of both crimes were female Payless store clerks. The perpetrator of the West Jordan murder took two pairs of shoes, while the perpetrator of the Draper Payless burglary had set a bag containing three pairs of shoes down on the floor in a back room of the store. Fingerprints matching those of Decorso were found at both stores following these crimes. At both stores, the perpetrator removed or cut the telephone cord. The perpetrator of both crimes apparently used or planned to use some type of rubber gloves. On the basis of the aforementioned similarities, the trial court did not abuse its discretion in concluding that these were "signature-like" crimes.

¶ 28 Second, the other crimes evidence in this case met the requirements of rule 402. It is obvious that this evidence was highly probative of a material fact to the crime charged—i.e., the killer's identity. The killer murdered the only witness at the West Jordan Payless who could have identified him. His identity was therefore a material and controverted issue at trial. Moreover, the evidence of the Draper burglary was highly probative of that issue because the modus operandi of that crime was very similar to those crimes committed at the West Jordan Payless.

¶ 29 Finally, the trial court acted within its discretion in determining that the evidence of the other crimes committed at the Draper Payless store met the requirements of rule 403. In *Shickles*, we stated:

"In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."

760 P.2d at 295–96 (quoting E. Cleary, *McCormick on Evidence* § 190, at 565 (3d ed.1984)). Applying the foregoing factors to this case, we conclude that under rule 403, the court did not abuse its discretion in holding that the other crimes evidence at issue was highly probative of the killer's identity while the risk of unfair prejudice was relatively low.

¶ 30 First, the evidence proving that Decorso committed the crimes at the Draper Payless was strong. Fingerprints found at that store matched those of Decorso. The perpetrator also left behind a special forces medallion similar to one Decorso owned. Finally, Sundee Fagg positively identified Decorso as the perpetrator of the burglary at that store.

¶ 31 Second, as it has already been pointed out, there are strong similarities between the crimes. They were "signature-like" crimes.

¶ 32 Third, the interval between the two crimes was relatively short. As noted above, Martinez was murdered on February 15, 1994, while the burglary of the Draper Payless occurred on September 17, 1994, only seven months later.

¶ 33 Fourth, the need for the other crimes evidence was very high in this case, and the efficacy of alternative proof was very low. As noted, Martinez's killer murdered

the only witness who could have identified him as the perpetrator of that crime. Furthermore, the only strong item of evidence found at the West Jordan Payless connecting Decorso to the murder was the fingerprint he left on the piece of duct tape attached to Martinez's pant leg. In short, the other crimes evidence admitted in this case was vital to the State's case.

¶ 34 Finally, the degree to which this evidence was likely to unfairly prejudice the jury was relatively minor. The crimes committed at the Draper Payless were minor when compared to the aggravated murder charge in this case. Decorso did not harm or injure his victims at the Draper Payless. Moreover, he did not take from that store any money or merchandise because his attempt was foiled before he could do so. Therefore, the crimes committed at the Draper Payless were not of the type likely to inflame the jury or incite overmastering hostility toward him.

¶ 35 In sum, the trial court did not abuse its discretion in admitting evidence of the other crimes Decorso allegedly committed at the Draper Payless. This evidence was offered for the proper, noncharacter purpose of establishing the killer's identity. It met the requirements of rule 402 and rule 403.

¶ 36 Notwithstanding the foregoing, Decorso asserts that the admission of this evidence violated his Sixth and Fourteenth Amendment rights under the United States Constitution because such crimes had not been adjudicated. However, he fails to cite any binding authority supporting this contention. In *State v. Lafferty*, 749 P.2d 1239, 1258–59 (Utah 1988), we rejected a similar constitutional challenge to the admission of other unadjudicated offenses during the penalty phase of a capital trial. We likewise reject Decorso's constitutional arguments concerning the other crimes evidence.

## II. MOTION FOR MISTRIAL

¶ 37 The second issue before us is whether the trial court erred in refusing to grant Decorso's motion for mistrial following the testimony of Ken Dougherty, a jailhouse informant who made improper references to

other crimes during cross-examination by the defense. Despite being specifically ordered not to refer to any other crimes Decorso allegedly committed, Dougherty testified as follows when asked about an article he had read in the newspaper: "No, it wasn't an article about the evidence against [Decorso], it was just what *some of the crimes* they were looking [at] and trying to charge him ·with . . . ." (Emphasis added.) Following this statement, Decorso moved for a mistrial. The trial court denied the motion, ruling that "the remark sailed right past the jury."

¶ 38 We review a trial court's denial of a motion for mistrial for abuse of discretion. *See State v. Robertson*, 932 P.2d 1219, 1230 (Utah 1997). "Unless a review of the record shows that the court's decision is *plainly wrong* in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *Id.* at 1231 (emphasis added). As noted above, the trial court determined that Dougherty's improper reference to other crimes was innocuous. This determination was not plainly wrong.

¶ 39 Dougherty's reference to other crimes was vague and came only after a lengthy direct examination and lengthy cross-examination. To lessen the possible impact of this statement, the court further allowed the defense to immediately conclude its cross-examination of Dougherty with the right to recall him at a later time. This allowed the proceedings to move along without undue interruption and directed the jury's attention to other matters.

¶ 40 In addition, Dougherty's statement regarding "other crimes" was insignificant. We have already held that the trial court properly admitted the evidence concerning the Draper Payless burglary. Moreover, the State adduced evidence showing that in addition to killing Martinez, the killer also stole cash and shoes from the West Jordan Payless store. Therefore, even if the jurors did hear and consider Dougherty's statement concerning "other crimes," they could well have understood him to be referring to either the Draper Payless burglary or the other

crimes that Decorso could have been charged with committing at the West Jordan store.

## III. SUPPRESSION OF EYEWITNESS IDENTIFICATION OF DECORSO AT THE POLICE LINEUP

¶ 41 The third issue presented by Decorso is whether the trial court erred in failing to suppress Sundee Fagg's identification of him at the police lineup. In particular, he argues that Fagg's identification was so unreliable that its admission constitutes a violation of his due process rights. We note, however, that he has failed to marshal the evidence supporting the trial court's finding that Fagg's identification was reliable and then show that such evidence was legally insufficient to support that finding. Instead, Decorso has merely argued selected portions of the evidence which he believes supports his own position. In light of this failure, we reject his challenge to the trial court's decision admitting this evidence.

¶ 42 Nevertheless, we note that even if Decorso had marshaled the evidence, we would still affirm the trial court's decision. In *State v. Ramirez*, 817 P.2d 774 (Utah 1991), we held that in determining whether an identification is reliable, a court must consider the following factors:

> "(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly."

*Id.* at 781 (quoting *State v. Long*, 721 P.2d 483, 493 (Utah 1986)). Fagg's identification of Decorso met all of the foregoing factors.

¶ 43 First, she had the opportunity to view Decorso as he walked into the Draper Payless store, posing as a customer, and later as he attempted to rob it after closing.

He did not wear a mask, and her view of him on both occasions was unobstructed.

¶ 44 Second, she had the capacity to observe him despite her fear when he attempted to rob her. Fagg testified that her fear did not distract her from focusing on him and placing his image in her mind. Moreover, as noted above, she observed him as he walked into the store posing as a customer, which was before she had reason to be afraid.

¶ 45 Third, her identification of Decorso has remained consistent and was not the product of suggestion. She has recanted neither her description of the perpetrator nor her identification of Decorso at the police lineup. Although it is true that she had seen photographs of Decorso prior to the lineup and had been told by a newspaper reporter that he was a suspect in the Draper burglary, she testified that she did not form an opinion that he was the perpetrator until the lineup. She further explained that her exposure to his picture prior to the lineup did not influence her identification of him because those did not show his build and did not allow her to compare his voice to that of the perpetrator.

¶ 46 Finally, there is little doubt that the nature of this event was of the type that Fagg would remember and relate correctly. She was being robbed by a lone gunman whom she had previously seen enter the store, posing as a customer. The trial court correctly observed that "[t]he excitement of the moment enhanced her opportunity and determination to make a careful observation."

¶ 47 In conclusion, we reject Decorso's challenge to the trial court's admission of Fagg's positive identification of him because he failed to marshal the evidence. However, even if he had met this burden, we would still reject his challenge to the trial court's decision because it was supported by the evidence and was otherwise correct.

## IV. ADMISSION OF THE VICTIM'S BLOODY CLOTHING AND A PHOTOGRAPH OF HER CORPSE

¶ 48 The fourth issue raised by this appeal is whether the trial court erred in ad-

mitting Martinez's bloody clothing and a photograph of her corpse into evidence. Decorso argues that the trial court should have excluded this evidence under rule 403 of the Utah Rules of Evidence, which requires the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." In *Lafferty*, we stated:

> Although the rule's language seems to require a simple balancing of probative value and potential for unfair prejudice, our past decisions have recognized that inherent in certain categories of relevant evidence is an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury.... Consequently, when evidence falling within such a category is offered, we have required a showing of unusual probative value before it is admissible under rule 403. In the absence of such a showing, the probative value of such evidence is presumed to be "substantially outweighed by the danger of unfair prejudice." The categories of evidence subject to that requirement include ... gruesome photographs of a homicide victim's corpse.

749 P.2d at 1256 (citations and footnote omitted). Decorso argues that the bloody clothing and photograph at issue here were gruesome and subject to the foregoing rule.

¶ 49 A review of this court's cases indicates that we have not tried to define the word "gruesome" as it applies in the rule 403 context. Rather, we have used a fact-intensive and descriptive process to determine whether a given photograph is gruesome.[3] Our research suggests that most courts that attempt to define "gruesome" rely on dictionary definitions of the word. For example, the Utah Court of Appeals defined gruesome as something that " 'inspir[es] horror or repulsion.' " *State v. Jir-*

*on*, 882 P.2d 685, 690 (Utah Ct.App.1994) (quoting *Webster's Third New Int'l Dictionary* 1005 (1986)). Dictionaries also use the words "grisly" and "hideous" to define gruesome. *Id.* at 1005. However, determining whether something inspires horror or repulsion or is hideous or grisly may prove as difficult for courts as determining whether something is obscene. An examination of our cases dealing with gruesome photographs yields a series of factors that may be far more beneficial than a dictionary definition in aiding courts in determining whether a photograph is gruesome.[4] We now discuss these factors.

¶ 50 First, we consider whether the photograph is in color or black and white, because color photographs are generally more disturbing because of their ability to provide the viewer with vivid images of blood, wounds, bruising, and the like. *See Lafferty*, 749 P.2d at 1257 (stating whether photograph is in color is factor for courts to consider in reviewing admissibility); *see also Dibello*, 780 P.2d at 1229 (noting that trial court abused its discretion in admitting color videotape). Color alone is not determinative, however. *See Lafferty*, 749 P.2d at 1256–57 (concluding that trial court abused its discretion in admitting black and white photograph of victim); *State v. Garcia*, 663 P.2d 60, 63–64 (Utah 1983) (concluding that trial court did not abuse its discretion in admitting color photographs of victim's body). Second, we consider whether the photograph is an enlargement or a close-up shot, again, because enlarged photographs and close-ups show greater detail and therefore are often more disturbing than a life-like view. *See Lafferty*, 749 P.2d at 1257. Also, an enlargement or close-up may give a distorted impression of the thing photographed. Third, we consider when the photograph was taken in relation to the crime and whether it depicts the

---

3. This process has been confused, however, by mingling the assessment of whether a photograph is gruesome with the assessment of the photograph's essential evidentiary value. As *State v. Dunn* makes clear, a trial court must first determine if the photograph is gruesome. *See Dunn*, 850 P.2d at 1222 n. 22 (Utah 1993). The court then presumes inadmissibility only if it found that the photograph is gruesome—which, as we have stated, is a legal question reviewed

for correctness. *See id.* Thus, whether a photograph has essential evidentiary value is irrelevant in determining whether it is gruesome.

4. This review eliminates those factors in our cases that attempt to ascertain a photograph's evidentiary value, instead focusing solely on those factors that make a photograph gruesome.

victim as found at the crime scene. *See id.* For example, we held in *Lafferty* that the trial court erred in admitting a black and white photograph of the infant victim because the photograph depicted the baby, "not as it was found, but repositioned in the crib so [the viewer could see] the gaping neck wound and blood covered face and body." *Id.* Fourth, we consider whether other details in a photograph, aside from the victim, may render a photograph gruesome. In the case of the photograph of the infant victim in *Lafferty,* we noted that the photograph showed the infant in its crib, with a baby bottle and toy next to the body. *Id.* Similarly, in *Dibello,* we noted that the videotape showed more than just the victim; it "amounted to a tour of the [victim's] trailer, including a view of stuffed toys and a picture on the wall of the cramped bedroom depicting [the victim and her alleged killer]." 780 P.2d at 1230. In these cases, the composition in the photograph may exacerbate the photograph's impact on the viewer.

¶ 51 In the instant case, despite the fact that bloodstains appeared on the right shoulder area of Martinez's blouse and on seventy-five percent of her white brassiere, neither item of clothing could be characterized as gruesome. The bloodstains were brown in color and were dried. The brassiere was not cut or slashed. The bloodstains appearing on her blouse were partially concealed by the dark blue color and pattern of the blouse.

¶ 52 With respect to the photograph of Martinez's body, we likewise hold that it was not gruesome. It depicted Martinez's partially clothed body; however, neither her breasts nor her genitalia were exposed. It showed a limited amount of blood, and while a small pool of blood appeared on the floor, it was virtually indistinguishable from Martinez's dark, curly hair. The photograph did not show Martinez's face, which was wrapped in a mask of duct tape; rather, it merely showed the back of her head. Finally, no gaping wounds were depicted in the photograph.

¶ 53 Because we have concluded that the trial court did not err in holding that neither the clothing nor the photograph was grue-

some, the standard rule 403 balancing test applies. Under this test, the court may exclude relevant evidence only if its probative value is substantially outweighed by the risk of unfair prejudice. *See* Utah R. Evid. 403; *see also Dunn,* 850 P.2d at 1222 (stating that under such test, a court "indulge[s] a presumption in favor of admissibility").

¶ 54 Despite Decorso's arguments to the contrary, bloody clothing and photographs of the victim are not excluded under rule 403 simply because the State could have established the same facts through other evidence. *See State v. Cobb,* 774 P.2d 1123, 1125 (Utah 1989) (holding that "fact that the same evidence could have been provided by purely testimonial means does not necessarily make a photograph inadmissible"). Rather, as noted above, evidence may be excluded under rule 403 only if its probative value is substantially outweighed by the risk of unfair prejudice. For the reasons stated below, we affirm the court's decision admitting the clothing and photograph at issue into evidence.

¶ 55 First, we hold that the trial court did not abuse its discretion in holding that the probative value of the blouse was not substantially outweighed by the risk of unfair prejudice. This evidence had significant probative value in establishing the killer's identity. At trial, the State sought to prove that the manner in which the killer cut off Martinez's blouse was consistent with the manner used by a trained EMT, such as Decorso. In contrast to the probative value of this evidence, its potential for unfair prejudice was slight. The brown bloodstains on the blouse were partially hidden by the blouse's dark-blue color.

¶ 56 Second, like the admission of the blouse, the trial court did not abuse its discretion in admitting Martinez's brassiere. It had significant probative value in showing that the killer murdered Martinez while engaged in the commission of or attempt to commit aggravated sexual assault, which is an aggravating factor under the aggravated murder statute. *See* Utah Code Ann. § 76–5–202(1)(d). Because the brassiere did not have any puncture holes in it and had not

been cut, it showed that the killer had exposed Martinez's breasts before stabbing her there. Moreover, the prejudicial effect of this evidence was minor and did not outweigh its probative value. As noted above, the bloodstains were dried and brown in color, thus, minimizing any prejudicial effect.

¶ 57 The photograph of Martinez's body was taken before it had been moved and was highly probative of the heinous manner in which this crime was committed, which is also an aggravating factor under the aggravated murder statute. *See id.* § 76–5–202(1)(q). It showed that the killer had bound her hands and feet, had removed her clothing, had stabbed her multiple times with a pair of scissors, and had bound her head and face with duct tape. Moreover, the risk of prejudice from this photograph was relatively low. It showed little blood and did not show any gaping wounds. Additionally, this was the only photograph of Martinez's corpse that was admitted into evidence. Thus we conclude the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice.

## V. THE SEARCH WARRANTS

¶ 58 The fifth issue is whether the trial court erred in refusing to suppress evidence seized at Decorso's storage unit and at his parents' home on the basis that the underlying warrants were issued without probable cause. Such evidence included rubber gloves, duct tape, and a can of pepper mace wrapped with duct tape.

¶ 59 In *State v. Thurman,* 846 P.2d 1256 (Utah 1993), we set forth the appropriate standard of review applied to a magistrate's finding of probable cause, stating:

> In reviewing the magistrate's finding of probable cause to support a search warrant based on an affidavit, we will find the warrant invalid only if the magistrate, given the totality of the circumstances, lacked a "substantial basis" for determining that probable cause existed. In conducting this review, we will consider the search warrant affidavit in " 'its entirety and in a common sense fashion' " and give "great

deference" to the magistrate's decision. The affidavit must support the magistrate's decision that there is a "fair probability" that *evidence of the crime will be found in the place or places named in the warrant.*

*Id.* at 1259–60 (citations and footnote omitted) (emphasis added). Under this standard, we hold that the magistrates who issued the two warrants in this case had a reasonable basis to believe that probable cause existed to search Decorso's storage unit and his parents' home.

¶ 60 Decorso nevertheless argues that the information contained in the affidavits supporting the two search warrants was "stale" and therefore failed to establish probable cause. "Staleness issues usually arise when a significant lapse of time occurs between the discovery of information suggesting that evidence of the crime can be found at a particular locale and the magistrate's finding of probable cause or the execution of the warrant." *Id.* at 1260 (citations omitted). The question that arises with staleness is whether "so much time has elapsed that there is no longer probable cause to believe that the evidence is still at the targeted locale." *Id.*

¶ 61 Decorso first asserts that the information contained in the affidavit supporting the warrant to search his storage unit was insufficient to establish probable cause because it failed to state when such information was discovered. The items sought by that warrant included one pair of "Honcho" brand boots, duct tape, and gloves. The affidavit supporting the warrant averred that the manager of Decorso's storage unit discovered a pair of "Honcho" brand boots in his storage unit while inventorying its contents in anticipation of auctioning them off for the nonpayment of storage fees. Decorso argues that because the affidavit failed to specify the time when the storage unit manager discovered such boots and because the warrant was issued more than a year after Martinez's murder, such information was stale.

¶ 62 However, viewing the affidavit in its entirety and in a common sense fashion, we hold that the information contained in

the affidavit was sufficient to establish that there was a "fair probability" that the "Honcho" boots or other relevant evidence would nevertheless be found at his storage unit. The State correctly argues that in deciding whether probable cause existed for the warrant, we must consider the nature of the evidence sought—i.e., whether such evidence was of the type likely to be kept for a long time. *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.7(a) (3d ed.1996) (stating that "when the crime under investigation is a prior murder, . . . the factor which is likely to emerge as the most important consideration [in deciding if probable cause exists] is the nature of the property sought"); *see also State v. Pease*, 222 Mont. 455, 724 P.2d 153, 160 (1986) (holding that probable cause existed, despite fifty-three-day lapse between discovery of the body and search, where items sought were of the type likely to be kept for long periods of time). We conclude that the nature of the items sought from Decorso's storage unit were of the type likely to be kept for long periods of time.

¶ 63   The most significant item sought at the storage unit was the pair of "Honcho" boots. The storage unit manager told police that he had seen a pair of such boots in Decorso's storage unit. Assuming that the manger saw these boots sometime after Martinez's murder, this information was at most thirteen months old when the warrant was issued. Although that is a considerable amount of time, the boots had continuing utility to Decorso, which reasonably could have exceeded thirteen months. Moreover, they were not the type of evidence that the perpetrator would quickly discard to conceal his crime.

¶ 64   In addition to the nature of the property sought, we think that the nature of area searched is also of importance in this case. We note that a storage unit is a place where items of personal property are stored for extended periods of time. Thus there was a substantial basis for the magistrate to believe that the items previously stored in the unit would still be there.

¶ 65   On the basis of the foregoing, we conclude that the magistrate did not err in finding probable cause to support the warrant to search Decorso's storage unit.

¶ 66   Decorso's next argument is that the affidavit supporting the warrant to search his parents' home failed to demonstrate a connection between him and his parents' home. The items sought at his parents' home included hair, fibers, blood, duct tape, firearms, a bank bag, and shoes.

¶ 67   The affidavit supporting the search warrant averred that near the time of Martinez's murder, Decorso resided at his parent's home. It further averred that shortly after Decorso's arrest on or about February 7, 1995, his father picked up all his personal belongings from the Midvale Fire Department, where he worked.

¶ 68   We reject Decorso's argument that the foregoing information was stale and insufficient to connect him to his parents home. As noted above, the boots and shoes sought by the warrant were of continuing utility to Decorso. Moreover, they were the type of item which he may have used and kept at his work. Thus, because his father had picked up all of his belongings at the Midvale Fire Department just before the warrant was issued, a "fair probability" existed that such items would be found at his father's home.

¶ 69   The firearms sought by this warrant were also of continuing utility to Decorso and not the type of item that would be quickly discarded. Since he did not shoot Martinez, he had little reason to hide or discard his firearms. Thus a fair probability existed that the gun with which Decorso may have struck Martinez might be found at his parents' home where he resided near the time of the murder.

¶ 70   Decorso's final argument regarding the evidence seized at his storage unit and at his parents' home is that this evidence should have been excluded under Utah Rule of Evidence 403. As stated above, such evidence included rubber gloves, the duct tape, and the mace can wrapped in duct tape. Decorso contends that the probative value of this evidence was minimal since many people own such items. Additionally, he specifically contends that the mace can

had no probative value because there was no evidence that Martinez's killer used mace.

¶ 71  However, even if we agreed that the probative value of this evidence was low, that value was not substantially outweighed by the danger of unfair prejudice.  The prejudicial effect, if any, from the admission of the rubber gloves, duct tape, and mace can wrapped in duct tape was nominal.  Moreover, we note that the mace can—wrapped in duct tape similar to that tape used by Martinez's killer—did have probative value in this case.  On the basis of the foregoing, we conclude that the seizure and admission of the foregoing evidence did not violate Decorso's Fourth Amendment rights.  Moreover, we hold that the trial court did not abuse its discretion in refusing to exclude it under rule 403.

## VI.  ADMISSION OF JAILHOUSE INFORMANT'S TESTIMONY

¶ 72  The sixth issue presented is whether the trial court erred in admitting the testimony of Ken Dougherty, a jailhouse informant, who testified that Decorso admitted to him that he murdered Martinez.  He contends that its admission violated his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution and that the court also should have excluded this evidence under Utah Rule of Evidence 403.  We address his constitutional arguments first.

¶ 73  The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  This amendment has absolutely no relevance to the question presented here.  Moreover, his argument concerning this point is not adequately briefed.  Accordingly, we reject his arguments concerning the Eighth Amendment.

¶ 74  Decorso's other constitutional argument is that the admission of unreliable, informant testimony, which is often coupled with the expectation or receipt of benefits, violates a defendant's rights to due process under the Fourteenth Amendment.  However, even if we assume that the admission of wholly unreliable, informant testimony is prohibited by the Fourteenth Amendment, we nevertheless conclude that Dougherty's testimony was sufficiently reliable to justify its admission in this case.

¶ 75  Dougherty was housed in the Salt Lake County jail during the same time as Decorso, and the two spoke to each other many times.  After pleading guilty to two charges of robbery with a firearms enhancement, Dougherty told the prosecutors in this case that he had information pertinent to Decorso.  After conducting a background check on Dougherty and his story, the State agreed to dismiss the firearms enhancements pending against Dougherty in his own criminal case and to seek postponement of his sentencing until after Decorso's trial in exchange for his testimony.

¶ 76  Dougherty testified at trial that Decorso admitted to him that he had robbed a shoe store and killed the female clerk.  He said that Decorso told him that the clerk became "unmanageable" so he hit her and "taped her up."  Decorso had also related that when the clerk kept "trying to scream," he hit her in the mouth with the butt of a gun, breaking her teeth.  He gave further details to Dougherty, admitting that he had stabbed the clerk "several times in the neck and chest area," had "lost control," had intercourse with her, and did not go to work for three days thereafter.

¶ 77  The trial court determined that Dougherty's testimony was "consistent with the other facts of the case and the circumstances of [his] [conversations] with [Decorso were] of sufficient quality that reasonable minds might believe that they occurred."  Decorso challenges this determination, arguing that some of Dougherty's testimony was uncorroborated by the evidence.

He specifically asserts that contrary to Dougherty's testimony, the evidence showed that he worked the day after Martinez's murder.  He also points out that there was no independent evidence establishing that Martinez's killer had raped her.  Finally, he contends that the killer could not have been aware that he broke Martinez's teeth because the evidence showed that her mouth was taped up when the killer struck her.  Therefore, he maintains that Dougerty falsely tes-

tified that Decorso had told him that he hit Martinez so hard that he broke her teeth.

¶ 78 Despite the foregoing points made by Decorso, we conclude that the majority of Dougherty's testimony was sufficiently corroborated to make it reliable. For instance, Dougherty's testimony that Decorso told him that he stabbed her several times in the neck and chest was corroborated by the coroner's testimony. Moreover, the killer did rob the store, and Martinez apparently struggled with him before her death. Her mouth was taped shut, and she had been hit in the mouth with what may have been the butt of a gun. In addition, we do not believe that Dougherty's testimony concerning Martinez's teeth was necessarily false. The killer may have heard or felt Martinez's dentures break as he was striking her in the mouth. Therefore, even though her mouth was bound in duct tape at the time, the killer nevertheless could have thought that he had broken her teeth.

¶ 79 Decorso's final argument regarding Dougherty's testimony is that the court should have excluded it under rule 403. In arguing this point, Decorso makes the assertion that this testimony had very little probative value. This testimony essentially consisted of Decorso's own confession to the murder; therefore, it was *highly* probative of his guilt. Moreover, we have already concluded that such testimony was sufficiently reliable to justify its admission, and we believe that any further questions concerning his credibility were properly left for the jury.

¶ 80 In contrast to the probative value of this evidence, we conclude that the danger of unfair prejudice presented by the admission of this evidence was slight. Although Decorso is correct that such testimony suggested that he tortured and sexually assaulted Martinez, these facts were also established by other evidence such as the stab wounds to each of her breasts and the exposure of her breasts and genitalia. Moreover, all evidence establishing a defendant's guilt is, to some extent, prejudicial to that defendant. However, rule 403 only excludes evidence which poses a danger of *unfair prejudice* that substantially outweighs the probative value of that evidence. Dougherty's testimo-

ny in this case posed little danger of such prejudice. Therefore, we hold that the trial court did not abuse it discretion in admitting Dougherty's testimony.

## VII. CUMULATIVE ERROR

¶ 81 The seventh issue Decorso raises is whether the cumulative effect of the trial errors requires reversal. Because we have thus far rejected each of Decorso's assignments of error during the guilt phase of his trial, this issue is moot. Accordingly, we affirm Decorso's aggravated murder conviction.

## VIII. ADMISSION OF OTHER CRIMES EVIDENCE DURING PENALTY PHASE

¶ 82 The final issue before us is whether the trial court erred in admitting evidence of other unadjudicated offenses during the penalty phase of Decorso's trial. We note that we resolved this question in *Lafferty*, where we upheld the admissibility of other unadjudicated offenses during the penalty phase of a capital trial. *See* 749 P.2d at 1258–60. Decorso nevertheless asserts that we should now overrule that decision.

¶ 83 In *State v. Menzies*, 889 P.2d 393 (Utah 1994), we stated, "Those asking us to overturn prior precedent have a substantial burden of persuasion. This burden is mandated by the doctrine of stare decisis." *Id.* at 398 (citation omitted). We further explained that although it may not do so lightly, "[a court] may overrule its own ... decision where 'the decision is clearly erroneous or conditions have changed so as to render the prior decision inapplicable.'" *Id.* at 399 n. 3 (quoting *State v. Dungan*, 149 Ariz. 357, 361, 718 P.2d 1010, 1014 (1986)).

¶ 84 Decorso has failed to meet his burden of persuading us that either our decision in *Lafferty* is clearly erroneous or conditions have changed so as to render our decision therein inapplicable. Accordingly, we affirm Decorso's sentence.

## CONCLUSION

¶ 85   Having reviewed each of Decorso's assignments of error, we conclude that each is without merit.   We therefore affirm his conviction and sentence.

¶ 86   Associate Chief Justice DURHAM, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE'S opinion.

¶ 87   Justice STEWART concurs in the result.

