2001 UT 5

**STATE of Utah, Plaintiff and Appellee,**

v.

**Steven E. VARGAS, Defendant and Appellant.**

No. 970024.

Supreme Court of Utah.

Jan. 26, 2001.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Salt Lake City, William F. Daines, Sandra L. Sjogren, Ogden, for plaintiff.

John T. Caine, Ogden, for defendant.

DURRANT, Justice:

¶ 1 A jury convicted Steven Vargas of murder, a first-degree felony under Utah Code Ann. § 76–5–203, for the death of his wife, Rebecca Vargas. Vargas appeals his conviction, alleging numerous errors at trial. We affirm.

## BACKGROUND

¶ 2 "We relate the facts in the light most favorable to the jury's verdict." *State v. Litherland,* 12 P.3d 92, 2000 UT 76, ¶ 2, 405 Utah Adv. Rep. 14. In January 1994, Steven and Rebecca Vargas married each other for the second time. Less than a month into the second marriage, Vargas was eating lunch at an Ogden restaurant with his aunt, Vicki Pubela. Pubela noted her pleasure at seeing the couple back together and asked him what he would do if his marriage failed again. Vargas told her he "would kill Rebecca first." Pubela then replied that he did not really mean that, to which he responded, "Oh, yes, I do."

¶ 3 Similarly, about eight months later, the Vargases had a fight at the North East Flagging Company, where the couple worked. Immediately afterward, Steven Vargas told several witnesses, "If she ever leaves me again, I'll kill her." Finally, in October of 1995, Steven Vargas and Gary Heward, a deputy Weber county attorney were discussing the O.J. Simpson murder trial, when Vargas stated, "If a black man can do that and get away with it, so can a Mexican."

¶ 4 A month before Vargas's conversation with Heward, Rebecca Vargas told Melinda McClain, Steven Vargas's youngest sister, that she was considering leaving her husband. Two months later, in November 1995, the couple told the Vargas family that they were divorcing.

¶ 5 On December 22, 1995, Robert Escobel, Steven Vargas's half-brother, called Steven Vargas to arrange a visit. During the conversation, "out of the blue," Vargas asked Escobel if he would kill his wife: "All you gotta do is, I'll fly you down here, you can hit her over the head with a bat a couple of times. She's so small, she'll die. I'll fly you right back. You'll be in and out in a few hours." Escobel refused, and his brother responded, "If you don't do it, I've got something else in the works."

¶ 6 Rebecca Vargas met with McClain three days later, on Christmas, at a local bowling alley and bar, Ben Lomond Lanes, for drinks. The two were joined by Monty Vorwaller, a police officer whom Rebecca Vargas was dating. Rebecca Vargas told McClain that in three days (December 28) she would be moving out of the trailer house in which she was then living with her husband and Mike Reid, his nephew, and into an apartment.

¶ 7 On December 27, Rebecca Vargas called Vorwaller and told him she was moving that day. Around noon, Reid helped her load some cleaning supplies into her Jeep. She then drove to her new apartment, which was one of three apartments she and her husband maintained and managed. After cleaning there for several hours, she returned to the trailer house, and Reid drove the Jeep to work.

¶ 8 After working until about 5:00 p.m. on that same day, Steven Vargas went to the Sand Trap, a private club, and then to Ben Lomond Lanes, where he talked with Garrett Bell and told him he was breaking up with his wife. At about 6:15, Steven Vargas went home. Before leaving, he told Bell he would be back at around 7:30 that evening to meet a woman; however, he did not return.

¶ 9 At about 6:30 p.m., the Vargases and their two children ate dinner at a buffet restaurant in Ogden. From this point until about 10:30 that evening, there are two versions of events.[1] According to Steven Vargas, after eating dinner, the family went to a theater and watched the movie "Toy Story." At 9:00 p.m., they went to another restaurant to get drinks and returned home at about 9:30 p.m. At this time, Rebecca Vargas left to go check on her apartment.

¶ 10 However, the State contends that between 6:30 and 7:00 that evening, Steven Vargas's nephew, Ryan Hawley, arrived at

the trailer house to babysit the couple's two children so that they could go out for the evening.[2] Because Reid had driven the Jeep to work, the Vargases left in their other vehicle, an Oldsmobile. At trial, the State theorized that sometime that evening between 7:00 p.m. and 10:00 p.m., Steven Vargas attacked and seriously wounded his wife outside her new apartment, then left her for dead. Afterward, he returned to the trailer house alone, arriving at about 10:00 p.m. He told Hawley that his wife had gone to make some minor repairs at her apartment. Hawley left shortly afterward.

¶ 11 Both sides agree that at about 10:30 p.m., Steven Vargas telephoned Melinda McClain, asking if Rebecca Vargas was with her. On learning that she was not there, Vargas asked McClain to check on her at the apartment, explaining he was unable to do so himself because Reid had taken the Jeep to work and his wife had taken the Oldsmobile to the apartment. McClain agreed to go to the apartment.

¶ 12 At about 11:00 p.m., Melinda McClain and her husband David arrived at the Vargases' trailer house. Reid had just returned with the Jeep, as well. The McClains told Steven Vargas that they had driven by the apartment and had seen the Oldsmobile parked out front. After talking for about forty-five minutes, the McClains prepared to leave, telling Steven Vargas they would drive by Ben Lomond Lanes to see if Rebecca Vargas had gone there, and, if they did not see her car there, they would again drive by the apartment.

¶ 13 Not finding the Oldsmobile at the bowling alley, Melinda and David McClain returned to the apartment. They parked behind the Oldsmobile, which was still there, and knocked on the apartment door. When nobody answered, Melinda McClain began to walk around the building. Before getting all

---

1. While we generally recite the facts in the light most favorable to the jury's verdict, we include Steven Vargas's version of events as it is material to an issue he raises on appeal.

2. While this version of events is consistent with Hawley's original statement to Officer David Lucas of the Ogden City Police Department, Hawley later recanted the statement, alleging Officer Lu-

cas had coerced him into stating that he had babysat on the night of the murder. Officer Lucas and David McClain, who witnessed the interview, denied this. Hawley asserted that, in fact, he had last babysat for the Vargases once or two weeks earlier. Both versions of Hawley's statement were presented at trial. *See* Discussion, Part I, *infra*.

the way around the building, however, she heard moaning. She brought her husband to the northeast corner of the porch to listen. In addition to the moaning, they also heard a low, calm, indiscernible, masculine voice.[3] Melinda McClain also thought she saw somebody crouched over in the bushes; however, her husband believed she was simply imagining things. Based on what they heard, the McClains concluded Rebecca Vargas was having sexual relations with someone. It was now about 12:30 a.m. The McClains left, went to a nearby convenience store, and called Steven Vargas, telling him his wife was at the apartment and "it sounded like she was having sex with someone." Vargas told them to "let her have her fun" and go home.

¶ 14 Instead of going home, the McClains returned to the apartment for the third time that night. This time they heard nothing. They went to Ben Lomond Lanes and then returned, once more, to the apartment. It was now about 1:00 a.m. As the McClains approached the apartment, they discovered the Vargases' Jeep parked next to the Oldsmobile. They drove to an adjacent street and waited. Shortly afterward, Steven Vargas walked out from the east side of the apartment building wearing his robe and shaking his head. As he approached the Jeep, he ducked down and appeared to wipe something off himself. The McClains drove away without confronting him, but he saw the couple stopped at a nearby intersection. Vargas pulled over in the Jeep, and the McClains got out of their car to speak with him. He stated that he did not want his wife to think he was spying on her and asked them to not "tell anybody I was here." As they parted, he reiterated, "Don't tell anybody I was here, and whatever happens, don't tell anybody I was here." The McClains again returned to the apartment, for the fifth time that night, but heard nothing and went home.

¶ 15 At about 6:00 that morning, Vargas called the McClains and once more asked them to check on his wife. Melinda McClain

told him to call the police and ask them to go to the apartment. He did so, but the police refused to send anyone over because Vargas said he had no reason to believe Rebecca was in danger. He again called the McClains and they went to the apartment.

¶ 16 Melinda McClain knocked on the door and, after getting no response, entered the apartment. She did not find Rebecca Vargas inside. She then began searching outside the building. As she came around the east side of the building, she found Rebecca Vargas's body lying on the ground. Rebecca Vargas was lying on her back. Her sweatshirt and bra had both been pulled up to her chin, exposing her chest and abdomen. The temperature that morning was about 20 degrees, and Rebecca Vargas's hair, face, and clothes were covered with frozen blood. There was a pool of blood by her head and a larger pool at her feet. Nearby was a battery-operated lantern, a set of keys, and a cigarette lighter. The lantern was covered in her blood and a clump of her hair. Later investigation revealed that Steven Vargas owned a similar lantern; however, it could not be found at his trailer house after the murder. Steven Vargas's fingerprints were identified on the lantern's battery.

¶ 17 Rebecca Vargas died from repeated blows to the top of her head, which extensively fractured her skull and resulted in swelling of the brain and loss of blood, as well as hypothermia. Some of the blows were inflicted while she was either standing or sitting upright. These injuries were located toward the back half of the top of the skull, and the weapon that inflicted these injuries was not found. The more serious injuries, however, were located toward the front of the skull and were inflicted while she was lying on the ground or pressed against a stationary object, such as a wall. Dr. Maureen Frikke, a forensic pathologist and the State's expert witness, testified that these injuries could have come from the lantern found at the scene. Dr. Frikke could not determine whether the injuries were all in-

---

3. At trial, the State contended that this was simply Rebecca moaning and there was no other person there at that time.

flicted in one attack or in two separate attacks, as the State contended at trial.[4]

¶ 18 Dr. Frikke concluded that Rebecca Vargas likely survived for several hours after the initial attack and was lying on her stomach for some time. She was discovered lying on her back, however, and the pool of blood at her feet was several feet away from any of her injuries at the time she was discovered. Thus, someone had moved her body after the initial attack but before Melinda McClain discovered it. Again, at trial, the State contended that this occurred when Vargas returned to the scene of the crime at about 1:00 a.m. Additionally, Dr. Frikke found that some of the injuries to Rebecca Vargas's face occurred after her death.

¶ 19 Shortly after the discovery of the body, the McClains went to the Ogden police station. At about 8:30 that same morning, Steven Vargas also went to the police station, explaining that he was there to pay traffic tickets and fees for expired license tags for the McClains. Upon Vargas's arrival, Officer Scott McGregor told him that he needed to talk to him. Vargas agreed to answer questions, but was not informed of his wife's death.

¶ 20 For six hours, the police intermittently, but extensively, questioned him about his whereabouts the previous night and his relationship with Rebecca Vargas. He never asked about his wife or why he was being questioned, although he was read his rights and asked how to contact Rebecca's family. Vargas confirmed that he had driven by the apartment the previous night, but asserted that he had remained in his car and not stopped. Later, however, he stated that he did get out of the car and went around to the east side of the building.

¶ 21 A subsequent search of the trailer house and Jeep revealed that the clothes Steven Vargas wore to the apartment the night before had been cleaned. Additionally, in the Jeep, police noted that the driver's side floor mat was "unusually free of leaves and cleaner than the rest of the jeep's floor areas, including the other floor mats." Nev-

ertheless, the police found leaf fragments under the driver's side floor mat. On one of the fragments, they found blood that matched Rebecca's DNA.

¶ 22 Steven Vargas was later arrested and held in the county jail. While there, two inmates alleged that he confessed to the killing. Don Baize was in jail on a charge of attempted murder. Following a conversation with Vargas, Baize asked his probation officer to talk to prosecutors about a plea bargain in exchange for information. The State agreed, and Baize gave a statement that Vargas had told him, "I knew Becky was going to leave, she was seeing someone else, it drove me crazy, and that is why I killed the f* * *ing bitch, I beat the f* * * out of the bitch." The other inmate, Jeff Combe, was a previous acquaintance of Vargas's and was in jail on forgery charges. According to Combe, Vargas confessed the killing to him to "get it off his chest." He allegedly told Combe that "I won't put up with her leaving me for a cop [i.e., Vorwaller]. I warned her if you ever leave me again I will kill you."

¶ 23 A jury convicted Vargas of murder, and he appeals.

## DISCUSSION

¶ 24 Vargas raises numerous issues on appeal. He contends that the trial court (1) denied his right to confrontation, under both the Sixth Amendment of the United States Constitution and article I, section 12 of the Utah Constitution, by allowing the jury to hear Hawley's original statement to Officer Lucas as to when he babysat the Vargases' children; (2) erred in not admitting evidence of prior acts by Officer Lucas; (3) erroneously admitted out-of-court statements; (4) erred in not granting a motion for mistrial; (5) erred in requiring him to provide the State with a list of defense witnesses prior to trial; and (6) erred in admitting autopsy photographs depicting the wounds to Rebecca Vargas's head. We address each contention in order.

4. Under the State's theory, Vargas initially attacked his wife with an unidentified object between 7:00 p.m. and 10:00 p.m. on the evening of the murder and then returned to the crime scene at about 1:00 a.m., at which time he hit her several more times with the lantern.

## I. RIGHT TO CONFRONTATION

¶ 25 About two weeks after Rebecca Vargas's death, Ryan Hawley told Officer David Lucas, of the Ogden City Police Department, that he babysat the Vargases' children on the evening of December 27, 1995, the night Rebecca Vargas was killed. At two pretrial hearings and at trial, however, Hawley denied the truth of this statement and, instead, asserted that he had last babysat for the Vargases one to two weeks before the murder. He testified that Officer Lucas had coerced him into making the original statement. However, Officer Lucas and David McClain, who witnessed the interview, denied this, and the original statement was admitted over Vargas's objection. Vargas contends he was denied his right to confrontation, as guaranteed by the Sixth Amendment of the United States Constitution [5] and article I, Section 12 of the Utah Constitution,[6] when Hawley's allegedly coerced, out-of-court statement was admitted at trial.

¶ 26 In furtherance of this contention, Vargas relies on *State v. Villarreal*, 889 P.2d 419 (Utah 1995) and *State v. Kendrick*, 538 P.2d 313 (Utah 1975). In *Kendrick*, the defendant was convicted of robbery. His "co-perpetrator was tried first and later gave testimony inculpating the defendant. At Kendrick's trial, the co-perpetrator refused to testify...." *Villarreal*, 889 P.2d at 424. Instead, his "prior testimony inculpating Kendrick was then read to the jury." *Id.* Similarly, in *Villarreal*, the defendant's co-perpetrator in a kidnaping and rape case was tried first and then refused to testify at the defendant's trial. While the co-perpetrator was on the stand at Villarreal's trial, the prosecutor recited to him a laundry list of factual propositions in the form of leading questions based on his earlier confession of Villarreal's in-

volvement in the crime; the co-perpetrator did not respond. *See id.* at 422–23.

¶ 27 In each case we found that the defendant's right to confront his accuser had been violated. Vargas argues that the admission of Hawley's testimony should be treated similarly. We disagree.

■ ¶ 28 Both *Kendrick* and *Villarreal* turned on the principle that a defendant must be given an effective opportunity to cross-examine the witnesses called against him. *See Villarreal*, 889 P.2d at 425 (requiring an "effective opportunity to cross-examine" the witness "on facts that were central to establishing [the defendant's] guilt"); *Kendrick*, 538 P.2d at 315 (stating that the "[r]ight of confrontation is based upon the notion that the accused should have an opportunity to cross-examine the witnesses against him"). However, in the instant case, Hawley was subject to meaningful cross-examination by Vargas's attorney. In *State v. Nelson*, we found, under both the federal and state constitutions, that " 'where the declarant is not absent, but is present to testify and to submit to cross-examination ... the admission of his out-of-court statements does not create a confrontation problem....' " 725 P.2d 1353, 1356 (Utah 1986) (quoting *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)). We further stated, "The essence of the confrontation right is the opportunity to have the accusing witness in court and subject to cross examination, so that bias and credibility can be evaluated by the finder of fact." *Id.* Accordingly, as Hawley was "physically present and subject to cross-examination," *id.*, the admission of his original statement did not violate Vargas's right to confrontation under either the Sixth Amendment of the United States Constitution or article I, section 12 of the Utah Constitution.[7]

5. The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him...." U.S. Const. amend. VI.

6. Article I, section 12 provides, "In criminal prosecutions the accused shall have the right to ... be confronted by the witness against him...." Utah Const. art. I, § 12.

7. Vargas attempts to distinguish *Nelson* and *Green*—the United States Supreme Court decision that guided *Nelson*—on the basis that, in *Green*, the prior, out-of-court statement was testimonial (made during a preliminary hearing), whereas here Hawley's statement to Officer Lucas was non-testimonial. While not addressing this distinction, however, *Nelson* itself involved a non-testimonial, out-of-court statement. *See id.* Further, while Vargas does not suggest any reason why the difference between testimonial and non-testimonial out-of-court statements is signifi-

## II. PRIOR ACTS

¶ 29 Vargas offered evidence that Officer Lucas had lied in a trial eleven years earlier and, in another trial, had omitted portions that were beneficial to the defendant when preparing a witness statement. Vargas contends the trial court committed reversible error in failing to admit this evidence of Officer Lucas's "coercive tactics in obtaining witness statements in other cases" under rule 404(b) of the Utah Rules of Evidence.

¶ 30 Before we can reach this issue, however, we must first determine whether rule 404(b) even applies to a witness who is not also the accused. Rule 404(b) reads as follows:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a *person* in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In other words, evidence offered under this rule is admissible if it is relevant for a non-character purpose

and meets the requirements of Rules 402 and 403.

Utah R. Evid. 404(b) (2000) (emphasis added). While rule 404(b) does not define a "person," rule 404(a) does. Rule 404(a) refers to three types of "persons": the "accused," the "victim," and the "witness." Thus, the issue is whether "person" in rule 404(b) should be read as broadly as it is in rule 404(a).

¶ 31 When interpreting an evidentiary rule, we apply principles of statutory construction. *See Butler v. Naylor,* 1999 UT 85, ¶ 9, 987 P.2d 41 (citing *State v. Robertson,* 932 P.2d 1219, 1228 (Utah 1997)). Thus, we first look to the plain language of the rule. *See State v. Robertson,* 932 P.2d 1219, 1228 (Utah 1997). Here, both subsections (a) and (b) use the term "person" in describing their scope. Applying principles of statutory construction, the plain language of a rule "is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same [rule]." *Lyon v. Burton,* 2000 UT 19, ¶ 17, 5 P.3d 616. Thus, we are obligated to define "person" harmoniously throughout rule 404. Accordingly, we hold that "person" as set out in rule 404(b) can be an "accused," a "victim," or a "witness," as in rule 404(a).[8]

cant, the *Green* Court persuasively reasoned that such a distinction is inconsequential:

Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury ... to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility. *It is, of course, true that the out-of-court statement may have been made under circumstances subject to none of these protections. But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections.* If the witness admits the prior statement is his ... the danger of faulty reproduction is negligible and the jury can be confident that it has before it two conflicting statements by the same witness. Thus, ... the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury; indeed, the very fact that the prior statement was not given under a similar circumstance may become the witness' explanation for its inaccuracy—an explanation a jury may be expected to understand and take into

account in deciding which, if either, of the statements represents the truth.

*Green,* 399 U.S. at 158–59, 90 S.Ct. 1930 (emphasis added) (footnotes omitted). We agree with this rationale and, thus, find no principled basis to distinguish *Green.*

8. We look "to the interpretations of the federal rules [of evidence] by the federal courts to aid in interpreting the Utah rules." *State v. Banner,* 717 P.2d 1325, 1333–34 (Utah 1986). In this instance, however, the federal courts are in conflict as to whether rule 404(b) applies to a "person" who is not also the defendant. *Compare Agushi v. Duerr,* 196 F.3d 754, 760 (7th Cir.1999) (holding "that Rule 404(b) does apply to third parties" and citing *Huddleston v. United States,* 485 U.S. 681, 685–86, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), as support for that proposition); *United States v. Blum,* 62 F.3d 63, 68 (2d Cir.1995) (noting that rule 404(b) "permit[s] admission against third parties of evidence of 'crimes, wrongs, or acts' if used to show 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident' ") (quoting Fed.R.Evid. 404(b)); *United States v. Stevens,* 935 F.2d 1380, 1401–06 (3d Cir.1991) (allowing a defendant to introduce "other crimes" evidence against a third party

Therefore, rule 404(b) governs the admissibility of the prior acts of Officer Lucas, a witness at trial.

¶ 32 Having determined that rule 404(b) governs this issue, we now consider whether the trial court committed reversible error in refusing to admit evidence of Officer Lucas's prior "coercive tactics in obtaining witness statements in other cases." The court found that the evidence was inadmissible under rule 404(b). On appeal, Vargas contends the evidence should have been admissible because its probative value outweighed its prejudicial value.

■ ¶ 33 We review rule 404(b) determinations for abuse of discretion under a three-prong test:

> [I]n deciding whether evidence of other crimes is admissible under rule 404(b), the trial court must determine (1) whether such evidence is being offered for a proper, noncharacter purpose under 404(b), (2) whether such evidence meets the requirements of rule 402,[9] and (3) whether this evidence meets the requirements of rule 403.[10]

*State v. Decorso*, 1999 UT 57, ¶ 20, 993 P.2d 837. We now turn to the facts of this case.

■ ¶ 34 First, Vargas contends that the trial court erred in rejecting his efforts to introduce testimony by Reed Richards, an attorney, that Officer Lucas had lied in a trial eleven years earlier. Next, Vargas argues that the trial court erred in not admitting evidence that, when preparing a witness statement in an earlier trial, Officer Lucas had omitted portions that were beneficial to the defendant. Vargas intended to present this evidence by calling as a witness Bernard Allen, an attorney involved in the earlier case. Relying on rule 403, the third prong of the rule 404(b) analysis, the trial court found the evidence from Richards and Allen inadmissible, as it would only confuse the issues at trial:

> [the State] makes what I think is a very telling observation, that we're going to create a trial within a trial. We are going to have to open up all these statements that Mr. Richards made, Mr. Allen may make, and be putting on Officer Lucas to try to persuade [the jury] that he didn't act improperly. And I think what it does is distract from the issues that are at trial. And it's my belief that Mr. Richards's and Mr. Allen's testimony does not prove any material fact in this case. And therefore, I'm excluding it at trial under Rule 404(b).

On appeal, Vargas argues that under rule 403, the third prong of the rule 404(b) analysis, the probative value of the evidence out-

under rule 404(b)); *United States v. McCourt*, 925 F.2d 1229, 1232 (9th Cir.1991) (finding that "[b]ecause Rule 404(b) plainly proscribes other crimes evidence of 'a person,' it cannot reasonably be construed as extending only to 'an accused'"); *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir.1989) (noting that where evidence "involves behavior of a witness other than a defendant ... [t]he party advancing the evidence must demonstrate that it is not offered 'to prove the character of a person in order to show action in conformity therewith'") (quoting Fed.R.Evid. 404(b)); *and United States v. McClure*, 546 F.2d 670, 672–73 (5th Cir.1977) (applying rule 404(b) to evidence of the pattern of coercion of a third party, thus evidencing the defendant's lack of intent); *with United States v. Gonzalez–Sanchez*, 825 F.2d 572, 583 (1st Cir.1987) (holding that "[r]ule 404(b) does not exclude evidence of prior crimes of persons other than the defendant"); *United States v. Sepulveda*, 710 F.2d 188, 189 (5th Cir.1983) (holding that rule 404(b) only applies to acts by the defendant individually); *and United States v. Morano*, 697 F.2d 923, 926 (11th Cir.1983) (holding that "[r]ule 404(b) does not specifically apply to exclude ... evidence [that] involves an extraneous offense committed by someone other than the defendant"). Many of the courts that have held either that Rule 404(b) does not apply to a "person" who is not also a defendant or that a lower standard of admissibility applies, *see, e.g., Stevens*, 935 F.2d at 1404–05, were dealing with "reverse 404(b)" situations wherein the defendant presented evidence of similar crimes to the one charged perpetrated by someone other than the accused. *See, e.g., id.* This issue is not before us.

9. Rule 402 of the Utah Rules of Evidence provides, "All relevant evidence is admissible ..." and "[e]vidence which is not relevant is not admissible."

10. Rule 403 of the Utah Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

weighed the danger of unfair prejudice, and, therefore, the trial court erred in excluding the testimony of Richards and Allen. However, Vargas's argument does not address the basis stated by the trial court for its decision. The trial court found the evidence inadmissible because its probative value was substantially outweighed by the danger of confusion of the issues at trial, not by its prejudicial value. Therefore, Vargas's contention is irrelevant to the trial court's finding. The trial court justifiably found that calling two witnesses to attack the credibility of another witness would only distract from the trial at hand. This being the case, we find that the trial court did not abuse its discretion in determining that evidence of Officer Lucas's prior acts was inadmissable under rule 404(b).[11]

## III. OUT–OF–COURT STATEMENTS

■ ¶ 35 Vicki Pubela testified at trial that Vargas told her, about two years before the murder, he would kill his wife if she ever left him. Gary Heward, a deputy Weber County attorney, testified that less than three months before the murder, Vargas, referring to the O.J. Simpson murder trial, told him that "if a black man can do that and get away with it, so can a Mexican." Vargas argues that the trial court committed reversible error in failing to suppress these statements for two reasons: first, the statements do not qualify as statements against interest under rule 804(b)(3) of the Utah Rules of Evidence, and, second, the statements' probative value is substantially outweighed by the danger of unfair prejudice, making the testimonies inadmissable under rule 403 of the Utah Rules of Evidence. We address each in turn.

### A. Rule 804(b)(3)

¶ 36 As a general rule, an out-of-court statement "offered in evidence to prove the truth of the matter asserted" is hearsay and is inadmissible. Utah R. Evid. 801(c). However, rule 804(b)(3) provides for the admission of such statements in certain situations:

The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness: ... A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Utah R. Evid. 804(b). Vargas contends that the statements he made to Heward and Pubela were both so remote in time that they do not qualify as "statements against interest," and, therefore, the statements should be excluded as hearsay under rule 801(c). We need not reach the question of whether the hearsay exception set forth in rule 804(b) is applicable here, however, because the statements do not qualify as hearsay in the first instance. Rule 801(d)(2)(A) removes an "admission by party-opponent" from the definition of hearsay: "A statement is *not hearsay* if ... [t]he statement is offered against a party and is ... the party's own statement...." Utah R. Evid. 801(d)(2) (emphasis added). In this case, the out-of-court statements were made by Vargas himself. Because Pubela and Heward were testifying of Vargas's own statement, the statements were admissions of a party-opponent under rule 801(d)(2)(A) and, therefore, *not hearsay*. Because the statements are not hearsay, rule 801(c) and rule 804(b)(3) are irrelevant to a determination of their admissibility. *See United States v. Mayes*, 917 F.2d 457, 463 (10th Cir.1990) (finding rule 804(b)(3) irrelevant to the determination of admissibility under rule 801(d)(2)(A)). This being the case, the trial court did not commit reversible error by admitting the out-of-court statements without considering rule 804(b)(3).

### B. Rule 403

¶ 37 Vargas next contends that the trial court erred in allowing Pubela and Heward

11. Even were we to conclude the trial court had abused its discretion in disallowing the evidence under rule 404(b), the offered testimony would likely still be inadmissible under rule 608(b) of the Utah Rules of Evidence, which provides,

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... *may not be proved by extrinsic evidence.*" (Emphasis added.) Vargas has not addressed this issue.

to testify regarding Vargas's statements to them because the probative value of the statements is substantially outweighed by the danger of unfair prejudice. *See* Utah R. Evid. 403.

### 1. The Statement Made to Pubela

█ ¶ 38 The State contends that the question of whether Vargas's statement to Pubela should have been excluded under rule 403 is not properly before us. We agree. Vargas made no mention of rule 403 in his initial memorandum in support of his motion in limine to exclude Pubela's testimony. Having failed to argue to the trial court that the evidence should be excluded under rule 403, he cannot raise the issue now. *See State v. Tillman,* 750 P.2d 546, 551 (Utah 1987) (stating that "some form of specific preservation of claims of error must be made a part of the trial court record before an appellate court will review such claim[s] on appeal").

█ ¶ 39 While Vargas's objection is not properly before us, nevertheless, we will consider an issue raised for the first time on appeal if the trial court committed plain error. *See State v. Helmick,* 2000 UT 70, ¶¶ 8, 9 P.3d 164. Claiming that admission of Pubela's testimony was a "clear[ ]" and "obvious" error, Vargas argues that the trial court's failure to exclude the statement under rule 403 was plain error. To succeed on this claim, Vargas has the burden of showing "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Dunn,* 850 P.2d 1201, 1208–09 (Utah 1993).

█ ¶ 40 Even were we to assume Vargas has satisfied the first two prongs of this test, he has not demonstrated that, "absent the error, there is a reasonable likelihood of a more favorable outcome." *Id.* Two witnesses saw Vargas at the crime scene on the night of the killing, and his fingerprints were found on the battery of the blood-covered lantern that likely inflicted the most serious injuries to Rebecca Vargas's skull. Further, traces of Rebecca Vargas's blood were found

in his Jeep. In light of this and other evidence, any error in admitting Steven Vargas's statement to Pubela was harmless. Our confidence in the jury's verdict has not been undermined, and, thus, the trial court did not commit plain error. Because it was not otherwise preserved for us on appeal, we do not reach the issue of whether the trial court erred in admitting Pubela's testimony.

### 2. The Statement Made to Heward

¶ 41 The State also contends that the question of whether the trial court should have excluded Vargas's statement to Heward under rule 403 is not properly before us. We agree. In arguing error, Vargas merely cites rule 403 and asserts that statement was obviously "highly charged and extremely prejudicial to the defendant."

█ ¶ 42 Under the Utah Rules of Appellate Procedure, the appellant's brief must "contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(9). " '[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *State v. Thomas,* 1999 UT 2, ¶ 11, 974 P.2d 269. Should the appellant fail to meet this standard, the court "must disregard th[e] issue." *State v. Wareham,* 772 P.2d 960, 966 (Utah 1989). Because Vargas has entirely failed, outside his bald allegation of error, to address the rule 403 issue in his brief, we do not address the trial court's ruling on that issue.

### IV. MOTION FOR MISTRIAL

¶ 43 Prior to trial, the State stipulated that it would not "enter[ ] into evidence any testimony concerning any alleged alias used by the Defendant." At trial, the State questioned Heward about his association with Vargas both socially (the two played basketball together) and professionally (Vargas had managed a rental property owned by Heward). Immediately after asking Heward about the termination of his business rela-

tionship with Vargas, the prosecutor asked Heward, "And did you know the defendant as Steve Vargas?" Heward answered, "I did not." Vargas objected, and the parties held a conference in Judge Lyon's chambers. Vargas's counsel moved for a mistrial based on the parties' stipulation to not "bring up aliases." Judge Lyon denied the motion, finding that Heward's response did not in any way prejudice Vargas. Instead, Judge Lyon directed the State to "rephrase the question that you [Heward] know him [Vargas] in connection with another business name, and I think with the jury hearing that kind of a question, . . . the problem can be taken care of." Upon returning to the courtroom, the prosecutor began questioning Heward again. "Mr. Heward, you've indicated that between 1992 and 1994 you rented your home through a company run by the defendant." "Correct," responded Heward. The prosecutor then asked, "What was the name of that company?" Heward answered, "Mancini Enterprises." After that, the State began questioning on a different subject and never again broached the subject of Vargas's name, business name, or aliases.

¶ 44 Vargas contends the trial court committed reversible error by denying his motion for a mistrial due to prosecutorial misconduct. In assessing this issue, we bear in mind that "[i]t is the trial court's responsibility to determine if an incident rises to the level requiring a mistrial, and it is the trial court which must decide if an 'incident *may have* or *probably* influenced the jury, to the prejudice of [the defendant].' " *State v. Cardall,* 1999 UT 51, ¶ 18, 982 P.2d 79 (quoting *State v. Robertson,* 932 P.2d 1219, 1230 (Utah 1997) (further citations omitted)). Accordingly, "[w]e will not reverse a trial court's denial of a motion for mistrial absent an abuse of discretion." *Id.* at ¶ 19, 982 P.2d 79 (quoting *Robertson,* 932 P.2d at 1230). We will not find such abuse unless " 'the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial. . . .' " *Id.* (quoting *Robertson,* 932 P.2d at 1231). Furthermore, " 'we review such a decision with just deference because of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings.' " *Id.* at

¶ 20, 982 P.2d 79 (quoting *Robertson,* 932 P.2d at 1231).

¶ 45 With respect to allegations of prosecutorial misconduct, this deferential standard regarding motions for mistrial "is met only if 'the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant.' " *State v. Harmon,* 956 P.2d 262, 276 (Utah 1998) (quoting *State v. Gardner,* 789 P.2d 273, 287 (Utah 1989)) (additional citations omitted). Vargas contends that the State's questions to Heward improperly prompted the jury to consider whether he had any aliases, resulting in prejudice. We disagree. The questions leading up to the question of whether Heward knew the defendant as Steve Vargas dealt with Heward's business relationship with him. The questions immediately following related to the name of that business. No actual alias was ever mentioned. In this context, there is no reason for the jury to have necessarily concluded that Vargas used an alias. It is likely that the jury concluded the State was referring to the name of the business, Mancini Enterprises. Indeed, since the State never returned to the topic, it is even more likely that the jury thought nothing at all of the question. We find it is improbable that the questioning influenced the jurors in any way. Outside this vague reference to aliases, there was ample evidence to support conviction, as noted above. In a question of prosecutorial misconduct, " '[i]f proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial.' " *Id.* (quoting *State v. Troy,* 688 P.2d 483, 486 (Utah 1984)) (further citations omitted). Vargas has failed to overcome this presumption. Because he did not demonstrate prosecutorial misconduct, we find that the district court did not abuse its discretion in denying the motion for a mistrial.

## V. WITNESS LIST

¶ 46 Prior to trial, the district court determined the State was entitled to a list of the defense witnesses under rule 16 of the Utah

Rules of Criminal Procedure. Vargas contends this was reversible error.

¶ 47 Rule 16(c) of the Utah Rules of Criminal Procedure provides, "Except as otherwise provided or as privileged, the defense shall disclose to the prosecutor ... *any ... item of evidence which the court determines on good cause shown should be made available* to the prosecutor in order for the prosecutor to adequately prepare his case." Utah R.Crim. P. 16(c) (emphasis added). In ordering Vargas to provide the State with a witness list, the district court determined that the "good cause" standard of rule 16(c) was met. Vargas argues that this conclusion was erroneous for two reasons: first, unless there is explicit statutory authority, courts "should exercise judicial restraint by refusing to permit prosecutorial discovery" and second, as applied by the trial court, rule 16(c)'s "good cause" requirement would erroneously require defendants to "automatically ... provide a list of witnesses to the State routinely."

¶ 48 We do not address either of Vargas's contentions. Even assuming the trial court erred in concluding there was good cause for allowing the State to obtain the defense witness list, we will "not reverse [the] trial court for committing harmless error." *State v. Loose*, 2000 UT 11, ¶ 10 n. 1, 994 P.2d 1237 (citing *Hall v. NACM Intermountain, Inc.*, 1999 UT 97, ¶ 21, 988 P.2d 942). Vargas must show that the court's ruling led to a "likelihood of prejudice." *State v. Whittle*, 1999 UT 96, ¶ 21, 989 P.2d 52. He has failed to do so. Indeed, this would have been difficult to do because he did not, in fact, comply with the trial court's ruling. While he did supply a witness list, of the nine witnesses identified, only one, in fact, testified on his behalf. That witness only established the foundation to admit a restaurant receipt into evidence. Three others testified for the State, and Vargas's counsel cross-examined them. The remaining identified witnesses did not testify. Moreover, Vargas called ten more witnesses whom he did not identify in the witness list at all.

¶ 49 In light of this, we find no likelihood of prejudice in Vargas's court-ordered provision of his witness list to the State. There-

fore, because any error in requiring the defense to provide the witness list to the State was harmless, we do not review the trial court's order requiring Vargas to do so.

## VI. PHOTOGRAPHS OF THE VICTIM

¶ 50 The court permitted the jury to view two photographs of Rebecca Vargas that were taken during her autopsy. One photograph shows the top of her head after the hair was shaven off, revealing multiple wounds. There is very little blood, however, and the photograph is cropped so as not to reveal her face, shoulders, or any other body part. The other photograph shows her fractured skull after the scalp had been pulled back. This picture was also cropped in such a manner that no other part of her body is visible, including the scalp itself. Further, there is relatively little blood, although portions of the brain can be seen along the fracture lines in the skull. Vargas argues that the trial court committed reversible error when it allowed the jury to view these photographs. Specifically, he contends the photographs of Rebecca Vargas's battered head were gruesome and, because their "prejudicial nature clearly outweighed any probative value," were inadmissible. We disagree.

¶ 51 Under rule 403 of the Utah Rules of Evidence, the trial court should only "exclude relevant evidence if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *State v. Decorso*, 1999 UT 57, ¶ 48, 993 P.2d 837 (quoting Utah R. Evid. 403). However, for certain types of evidence, including "gruesome photographs of a homicide victim's corpse," this balancing test is dropped in favor of a presumption of inadmissibility that can only be overcome by "a showing of unusual probative value." *Id.* (quoting *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988)).

¶ 52 The initial question, then, is whether the two photographs the State showed to the jury were gruesome. This court has described four factors to consider in determining whether a photograph is gruesome:

First, we consider whether the photograph is in color or black and white, because color photographs are generally more disturbing because of their ability to provide the viewer with vivid images of blood, wounds, bruising, and the like.... Color alone is not determinative, however.... Second, we consider whether the photograph is an enlargement or a close-up shot, again, because enlarged photographs and close-ups show greater detail and therefore are often more disturbing than a life-like view.... Also, an enlargement or close-up may give a distorted impression of the thing photographed. Third, we consider when the photograph was taken in relation to the crime and whether it depicts the victim as found at the crime scene.... Fourth, we consider whether other details in a photograph, aside from the victim, may render a photograph gruesome [because] the composition in the photograph may exacerbate the photograph's impact on the viewer.

*Id.* at ¶ 50, 993 P.2d 837 (citations omitted). We now consider the photographs of Rebecca Vargas in light of these factors.

¶ 53 Each of the first three factors is met in this case, which would normally suggest the photographs are gruesome. However, although the photographs were in color, close-up, slightly enlarged, and depicted the body after it had been moved from the crime scene, this alone is not determinative. We must consider these factors in light of the rationale behind them.

¶ 54 Under the first factor, "color photographs are generally more disturbing because of their ability to provide the viewer with vivid images of blood, wounds, bruising, and the like." *Id.* Here, however, the wounds depicted in both photographs had been washed and there was relatively little blood. Thus, it is unlikely that the photographs were more disturbing than black and white images would have been. This is also true with respect to the second factor. While close-up and enlarged photographs tend to be more gruesome than life-like photographs, we find that these photographs, depicting clean wounds and very little blood, were no more disturbing than life-like shots

would have been. For the same reasons, although the body had been removed from the crime scene, the head had been shaven, and, in one photograph, the scalp had been removed to reveal the skull, the photographs were likely less gruesome than pictures of the crime scene itself. Thus, none of these three factors support Vargas's contention that the photographs were gruesome.

¶ 55 Finally, we consider any other details that may tend to exacerbate the photograph's impact on the viewer. For instance, in *Lafferty*, we noted the impropriety of a photograph of an infant homicide victim that also contained images of the infant's crib, a baby bottle, and a toy. *See* 749 P.2d at 1257. In the instant case, however, there are no such details in the photographs that would tend to exacerbate their impact. On the contrary, they have been cropped in such a manner that Rebecca Vargas's face, shoulders, and other body parts are not visible, there is very little blood, and, in the photograph of the skull, the scalp, which had been pulled back, is not visible. Therefore, our examination of this factor does not support Vargas's contention that the photographs should have been excluded.

¶ 56 Other than demarcating the types of injuries Rebecca Vargas received, there is nothing inflammatory about the photographs. While they are graphic and sobering, we conclude that they are not gruesome under the test we have articulated. Accordingly, the issue for our determination becomes whether the photographs are admissible under rule 403, i.e., whether they have some probative value that is not substantially outweighed by the prejudicial nature of such photographs.

¶ 57 Dr. Maureen Frikke, a pathologist and an expert witness for the State at trial, used the photographs to explain how at least some of Rebecca's injuries could have resulted from repeated blows by the blood-stained lantern that was found at the crime scene with Steven Vargas's fingerprints on its battery. Thus, the photographs had probative value with respect to the State's efforts to demonstrate Vargas's involvement in the murder. In light of the cropping of the photographs and the cleanliness of the

wounds, the probative value of the photographs was not substantially outweighed by their prejudicial value. Therefore, the trial court did not commit reversible error in admitting the photographs.

## CONCLUSION

¶ 58 Steven Vargas has failed to raise any issues that compel us to reverse the judgment of the court below. We affirm his conviction.

¶ 59 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT's opinion.