2005 UT App 283

**STATE of Utah, Plaintiff and Appellee,**

v.

**Billy Frank SPILLERS, Defendant and Appellant.**

**No. 20040346–CA.**

Court of Appeals of Utah.

June 23, 2005.

---

Linda M. Jones, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, and Matthew D. Bates, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges BILLINGS, DAVIS, and THORNE.

## OPINION

BILLINGS, Presiding Judge:

¶ 1 Defendant Billy Frank Spillers appeals his conviction for first degree murder, in violation of Utah Code section 76–5–203. *See* Utah Code Ann. § 76–5–203 (1999). Defendant asserts that the trial court erred by failing to instruct the jury on the lesser included offense of manslaughter and by excluding evidence of the victim's criminal past. We reverse and remand.

## BACKGROUND

¶ 2 On the afternoon of October 25, 1999, Defendant and his longtime friend, James "Bo" Jackson, were at Defendant's home. Jackson's stepbrother, Keith Harris, was also

present. Defendant's wife, Alicia Spillers; Defendant's cousin, Tatanisha Spillers; and Defendant all testified at trial that Jackson and Harris began arguing and that Defendant asked the two men to take their argument outside. However, Harris testified at trial that it was actually Jackson and Defendant who were arguing. Harris stated that Defendant started waving a gun around and shouting and that he ordered everyone out of the house.

¶ 3 Jackson, Harris, and Defendant then got into their respective cars and drove toward Jackson's house. However, instead of going to Jackson's house, Harris drove home. Defendant testified that he followed Jackson home because he thought that he and Jackson would drop off Jackson's vehicle and then Defendant would drive Jackson to the mechanic's for a car that he had left earlier. However, by the time they arrived at Jackson's home, it was too late to pick up the vehicle.

¶ 4 Defendant testified that while at Jackson's home, Jackson became angry and accused Defendant of snitching on him to drug enforcement agents. Defendant testified that Jackson's accusation made him nervous. Defendant stated that Jackson then retrieved a gun from the couch in the living room and brought it to the kitchen. When Defendant turned his back to face the sink, Jackson attacked Defendant from behind, striking him on the head with the butt of the gun. Defendant testified that the blow to his head dazed him and that he felt "cloudy." Defendant claims that he then turned toward Jackson, grabbed his arms, and pushed Jackson away. Defendant had a gun tucked in the waistband of his pants and when Jackson cocked his arm to hit Defendant again, Defendant drew his gun and shot Jackson three times. However, Defendant claims that he only remembers firing the gun once. Defendant stated that he picked up Jackson's gun and ran out of the house through the sliding glass door, tripped and broke his ankle, and dropped both guns in the yard. Defendant did not see his gun so he picked up Jackson's gun and ran to his car. Defendant testified that he felt scared because he had just shot his friend.

¶ 5 Jackson's twelve-year-old nephew, Brian Harris (Brian), testified that he heard Jackson and Defendant arguing from his bedroom and heard a gun cock. Brian also stated that he heard Jackson say to Defendant, "You don't have to shoot me . . . [b]ecause I didn't do anything to you." Brian testified that he heard Defendant say, "If you get in my face I'm going to blow your head off." Brian then heard three gunshots and Defendant attempting to leave the house through the sliding glass door.

¶ 6 Jackson's girlfriend, Jessica Vasquez, testified that she was sleeping with her one-year-old baby in the room directly above the kitchen. Vasquez testified that she awoke to the argument between Jackson and Defendant. Vasquez stated that she heard Jackson say to Defendant, "I don't believe you're going to do this to me." Vasquez then heard the two men yell profanities to one another and then she heard three gunshots. Vasquez testified that she ran downstairs and saw Jackson lying on his back on the kitchen floor and Defendant trying to open the sliding glass door.

¶ 7 The medical examiner testified that Jackson was shot in the left chest, the thigh, and the genitals. He stated that the first shot entered Jackson's chest, severing his aorta and his spinal cord, and caused him to collapse immediately. He further testified that the positioning of Jackson's body at the time of death would support Defendant's theory that Jackson was in the process of taking a step toward Defendant with his right arm cocked back to swing when Defendant fired the gun. However, the medical examiner also stated that if a person were moving forward when he was shot and his spinal cord severed, it is likely that the forward momentum would cause the person to fall forward.

¶ 8 After Defendant was booked into the Salt Lake County Jail on October 26, 1999, he was examined by a forensic nurse. She testified that Defendant had a hematoma on the back of his head that was more than two inches in diameter and an inch high which was consistent with Defendant receiving a blow to the head the prior evening. She also stated that Defendant's pupils were sluggish and small, which may have related to the

head injury or the prescription he had taken for his broken ankle.

¶ 9 Several witnesses testified to Jackson's reputation for violence. He was known to have a bad temper, to be combative, to get into fights, and to be aggressive.

¶ 10 On October 28, 1999, the State charged Defendant with one count of murder with a weapons enhancement, a first degree felony, in violation of Utah Code section 76–5–203. *See* Utah Code Ann. § 76–5–203. On February 14, 2000, the trial court conducted a scheduling conference and ordered a pre-trial conference on June 5, 2000. The trial court instructed counsel to bring their respective proposed jury instructions and voir dire questions. However, there is nothing in the record demonstrating that a pretrial conference took place on June 5, 2000. The trial began on June 6, 2000. On June 7, 2000, the trial court informed counsel that it needed to see any proposed instructions on lesser included offenses. Defendant's counsel stated that he was continuing to draft proposed instructions. On June 8, 2000, after an in-chambers conference regarding jury instructions, the court again asked Defendant's counsel about the lesser included offense instructions. Counsel informed the court that he was conferring with Defendant regarding the instructions.

¶ 11 At the close of evidence, the trial court and the parties discussed jury instructions on the record. The trial court stated, "During the course of talking about the jury instructions we have had a lot of discussion about a jury charge on the issue of manslaughter. No instruction has been formally tendered to the court. Is there anything either of you would like to put on the record with respect to that?" Defense counsel stated that "I do have in fact an instruction prepared." The trial court concluded that the evidence failed to support the request for instruction on manslaughter and instructed the jury on murder and self-defense only.

¶ 12 Defendant filed a motion for a new trial. After other proceedings not related to this appeal at both the trial and appellate levels, the trial court denied Defendant's motion for a new trial. Defendant appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Defendant argues that the trial court erred by refusing to instruct the jury on the lesser included offense of extreme-emotional-distress and imperfect-legal-justification manslaughter. "Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness." *State v. Hamilton,* 827 P.2d 232, 238 (Utah 1992). In considering a defendant's request for a lesser included offense instruction, we "view the evidence and inferences that can be drawn from it in the light most favorable to the defense." *State v. Crick,* 675 P.2d 527, 539 (Utah 1983). Furthermore, "[t]he requirements ... for the inclusion of a lesser included offense instruction requested by the defendant should be liberally construed." *State v. Hansen,* 734 P.2d 421, 424 (Utah 1986).

¶ 14 Defendant further asserts that the trial court erred by failing to admit evidence of Jackson's prior criminal acts. "When reviewing a trial court's decision to admit evidence under rule 404(b) [of the Utah Rules of Evidence], we apply an abuse of discretion standard." *State v. Widdison,* 2001 UT 60, ¶ 42, 28 P.3d 1278. However, "admission of prior crimes evidence itself must be scrupulously examined by trial judges in the proper exercise of that discretion." *State v. Decorso,* 1999 UT 57, ¶ 18, 993 P.2d 837.

## ANALYSIS

### I. Manslaughter Instructions

¶ 15 Defendant argues that the trial court erred by failing to provide the jury with instructions on both extreme-emotional-distress and imperfect-legal-justification manslaughter. Our supreme court set forth the test for deciding whether a defendant is entitled to a lesser included offense instruction in *State v. Baker,* 671 P.2d 152, 158–59 (Utah 1983). When a defendant requests an instruction on a lesser included offense, "it must be given if (i) the statutory elements of greater and lesser included offenses overlap to some degree, and (ii) the evidence pro-

vides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *State v. Hansen*, 734 P.2d 421, 424 (Utah 1986) (discussing the *Baker* test for lesser included offense instructions) (quotations and citations omitted); *see* Utah Code Ann. § 76-1-402(4) (1999) ("The court shall not be obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."). In other words, "[w]hen the evidence is ambiguous and therefore susceptible to alternative interpretations, and one alternative would permit acquittal of the greater offense and conviction of the lesser, a jury question exists and the court must give a lesser included offense instruction at the request of the defendant." *Crick*, 675 P.2d at 532 (quoting *Baker*, 671 P.2d at 159).

¶ 16 The State concedes that the first prong of the *Baker* test is satisfied as the elements of extreme-emotional-distress manslaughter and imperfect-legal-justification manslaughter overlap with the elements of murder. *See* Utah Code Ann. § 76-5-203(3)(a)(i), (ii) (including both types of manslaughter as affirmative defenses within the murder statute that require proof of all the elements of murder plus a finding that the defendant acted under either extreme emotional distress or a mistaken, but reasonable, belief that his conduct was legally justified). Accordingly, the only issue before this court is whether there exists a rational basis in the evidence to acquit Defendant of murder and convict him of manslaughter.

### A. Extreme–Emotional–Distress Manslaughter

¶ 17 Under Utah Code section 76-5-203(3)(a)(i), murder may be reduced to manslaughter where the defendant caused the person's death "under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." *Id.* § 76-5-203(3)(a)(i). However, "emotional distress does not include ... a condition resulting from mental illness ... or ... distress that is substantially caused by the defendant's own conduct." *Id.* § 76-5-203(3)(b)(i), (ii). Fur-

ther, "[t]he reasonableness of an explanation or excuse ... shall be determined from the viewpoint of a reasonable person under the then existing circumstances." *Id.* § 76-5-203(3)(c).

¶ 18 In *State v. Shumway*, 2002 UT 124, 63 P.3d 94, the Utah Supreme Court considered whether the defendant in a murder case was entitled to an instruction on extreme-emotional-distress manslaughter. *See id.* at ¶¶ 9-13. The fifteen-year-old defendant stabbed his friend during a sleep over and was charged with murder. *See id.* at ¶¶ 2-3. The court held that the defendant's interpretation of the evidence supported extreme-emotional-distress manslaughter. *See id.* at ¶¶ 10-11, 13. In particular, on the morning of the stabbing, the victim was upset at the defendant for "beating [him] at video games." *Id.* at ¶ 10. At bedtime, the victim retrieved a knife from the kitchen "that he began to throw in the air and catch." *Id.* The victim then lunged at the defendant and began to poke him with the knife. *See id.* The boys fought over possession of the knife and, in his anger, the defendant stabbed the victim thirty-nine times. *See id.* The defendant also suffered some stab wounds to his hand, and there was evidence that the victim had a reputation for losing his temper. *See id.* In addition, evidence was presented that the defendant had pent-up anger over being bullied and pushed around by his peers prompting him to stab the victim. *See id.*

¶ 19 The court concluded that under this interpretation of the evidence, the defendant

> arguably did not bring about the disturbance by his own conduct, but rather [the victim] initiated a violent and traumatic act by attacking [the defendant] with the knife. [The victim's] aggressive conduct could be found by a jury to provide a reasonable excuse or explanation for [the defendant's] stress and rage that resulted in [the defendant] stabbing [the victim] in the throat and chest.

*Id.* at ¶ 11. Thus, the court held that while the defendant's interpretation of the evidence was not the only reasonable interpretation, the defendant was nonetheless entitled to an instruction on extreme-emotional-distress manslaughter because a jury could conclude

that the defendant caused the death " 'under the influence of extreme emotional distress for which there is a reasonable explanation or excuse.' " *Id.* at ¶ 13 (quoting Utah Code Ann. § 76–5–203(3)(a)(i)).

¶ 20 Like Shumway, Defendant's interpretation of the evidence supports the necessity for a jury instruction on extreme-emotional-distress manslaughter. Specifically, Defendant and Jackson were longtime friends. On the night in question, Jackson was angry with Defendant and accused him of cooperating with drug enforcement agents against Jackson. Jackson's accusation made Defendant feel nervous. Jackson retrieved a gun from the couch and attacked Defendant from behind, striking him on the head with the butt of the gun. The blow to the head dazed Defendant and made him feel "cloudy." Defendant and Jackson engaged in a struggle and Defendant pushed Jackson away. Jackson cocked his arm to hit Defendant again. Defendant then drew his gun and shot Jackson three times but Defendant only remembers firing the gun once. Defendant had a hematoma on the back of his head that was more than two inches in diameter and an inch high. In addition, Jackson had a reputation for being violent, combative, and aggressive. Thus, the jury could have found that Defendant caused Jackson's death "under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." *Id.* (quotations and citations omitted). Accordingly, under *Shumway*, Defendant was entitled to a jury instruction on extreme-emotional-distress manslaughter.

¶ 21 However, the State argues that the circumstances in the instant case are more analogous to the case of *State v. Kell,* 2002 UT 106, 61 P.3d 1019. We disagree. In *Kell,* the Utah Supreme Court held that the "great weight of the evidence" was contrary to Kell's claim of imperfect-legal-justification manslaughter. *Id.* at ¶ 25. Specifically, there was ample evidence demonstrating that (1) the killing was motivated by racism (e.g., Kell was a white supremacist inmate who had expressed a desire to harm an African-American inmate and yelled racial epithets during and after the attack); (2) even if Kell acted in part out of self-defense, he "could

not have believed himself to be in imminent danger at the time of the attack;" and (3) the victim was attacked from the rear and stabbed repeatedly while unarmed and handcuffed. *Id.* The court concluded that "[a]lthough Kell testified that he believed he was acting out of self-defense, no persuasive evidence was offered to suggest that Kell believed that killing [the victim] in prison would be reasonable under the circumstances." *Id.*

¶ 22 Defendant's case is significantly different from *Kell.* In addition to Defendant's testimony, there was evidence from the medical examiner and a forensic nurse that corroborated Defendant's version of events. Several witnesses testified as to Jackson's reputation for aggression and violence. Thus, viewing the evidence in a light most favorable to Defendant, *see State v. Crick,* 675 P.2d 527, 532 (Utah 1983), we conclude that the evidence presented supports Defendant's claim that Jackson's violent attack of Defendant caused him to suffer extreme emotional distress. That is, Jackson's "aggressive conduct could be found by a jury to provide a reasonable excuse or explanation for [Defendant's emotional reaction] that resulted in" Defendant shooting Jackson three times. *Shumway,* 2002 UT 124 at ¶ 11, 63 P.3d 94. Accordingly, because the "requirements . . . for the inclusion of a lesser included offense instruction requested by the defendant should be liberally construed," *State v. Hansen,* 734 P.2d 421, 424 (Utah 1986), we hold that Defendant was entitled to have the jury instructed on extreme-emotional-distress manslaughter. Therefore, we conclude that the trial court erred by not giving the jury instruction.

### B. Imperfect–Legal–Justification Manslaughter

¶ 23 Under Utah Code section 76–5–203, murder may be reduced to manslaughter where the defendant caused the person's death "under a reasonable belief that the circumstances provided a legal justification or excuse for his conduct although the conduct was not legally justifiable or excusable under the existing circumstances." Utah Code Ann. § 76–5–203(3)(a)(ii). The "reasonable belief" is determined "from the view-

point of a reasonable person under the then existing circumstances." *Id.* § 76-5-203(3)(c).

■ ¶ 24 In *Shumway*, the Utah Supreme Court considered the same evidence that supported the defendant's theory of extreme-emotional-distress manslaughter for imperfect-legal-justification manslaughter and concluded that based on that evidence, the defendant was entitled to have the jury instructed on imperfect-legal-justification manslaughter. *See* 2002 UT 124 at ¶ 14, 63 P.3d 94. Similarly, we believe that the evidence supporting Defendant's theory of extreme-emotional-distress manslaughter also supports his theory of imperfect-legal-justification manslaughter.

¶ 25 The State argues that the evidence presented at trial supports only two conflicting interpretations: (1) perfect self-defense where Defendant was about to suffer death or serious bodily injury when Jackson struck him with the butt of the gun, or (2) intentional murder where Jackson did not strike Defendant. However, we believe that the jury in this case could have found that the evidence supported other interpretations. Specifically, the evidence is susceptible to an interpretation that Defendant was entitled to defend himself against an attack by Jackson but not entitled to use deadly force. The evidence presented at trial demonstrates that Jackson did not use a gun to shoot Defendant, but used the butt of the gun to strike Defendant in the back of the head. The jury could have found that Jackson's conduct did not cause serious bodily injury to Defendant, and any risk of death was remote. *See* Utah Code Ann. § 76-1-601(10) (1999) (defining "serious bodily injury"). Thus, the jury could have found that there was a legitimate issue as to whether or not Defendant was entitled to use deadly force to defend himself where Jackson did not threaten to shoot Defendant but merely struck him with the butt of the gun. Accordingly, the jury could have found that the evidence supports imperfect-legal-justification manslaughter. *See id.* § 76-5-203(3)(a)(ii).

¶ 26 We hold that Defendant was entitled to instructions on both extreme-emotional-distress and imperfect-legal-justification manslaughter. Therefore, we conclude that the trial court erred by failing to so instruct the jury, and, accordingly, we reverse and remand for a new trial.

## II. Evidence of Jackson's Criminal Past

■ ¶ 27 Defendant argues that the trial court erred by refusing to admit evidence of Jackson's criminal past. When determining whether to admit evidence of other crimes, a trial court must determine "(1) whether such evidence is being offered for a proper, non-character purpose under 404(b), (2) whether such evidence meets the requirements of rule 402, and (3) whether this evidence meets the requirements of rule 403." *State v. Decorso*, 1999 UT 57, ¶ 20, 993 P.2d 837.

¶ 28 Rule 404(b) of the Utah Rules of Evidence provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Utah R. Evid. 404(b). A " 'person' as set out in rule 404(b) can be an 'accused,' a 'victim,' or a 'witness.' " *State v. Vargas*, 2001 UT 5, ¶ 31, 20 P.3d 271 (quoting rule 404(a) of the Utah Rules of Evidence). Rule 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided" by constitutional provisions, statutes, or rules. Utah R. Evid. 402. Under rule 403, evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403.

¶ 29 Defendant sought to introduce evidence of (1) a recent drug bust of Jackson's home by the West Valley City Police one month prior to the night of the killing and (2) charges of possession of a dangerous weapon and drug paraphernalia pending against Jackson. The State counters that this evi-

dence is not relevant to Jackson's actions toward Defendant on the night in question.

¶ 30 Under Defendant's version of events, Jackson was angry with him because Jackson believed that Defendant had helped drug enforcement agents seize drugs or money or both in connection with a drug deal in Kansas City. However, in Defendant's brief, he claims that Jackson believed Defendant had cooperated with drug enforcement agents on the raid of his home a month prior to the killing. This is not at all clear from the record. Defendant testified that Jackson believed that Defendant "had something to do with [Jackson's] money getting tooken [sic] in Kansas City" because Defendant was "the only one knew that [Jackson's cocaine] was coming back to Salt Lake City from Kansas City." Defendant did not testify as to the drug raid at Jackson's home in which the West Valley Police seized two "keys" of marijuana. If the drug raid at Jackson's home in West Valley City were somehow connected to the Kansas City drug bust such that Jackson was actually accusing Defendant of cooperating with agents in the seizure of the two "keys" of marijuana, this evidence may be relevant to Jackson's intent and state of mind that night. However, the record is not clear. On retrial, we leave it to the trial court to scrupulously examine the evidence of the two drug busts to see whether the West Valley drug bust is relevant. *See Decorso,* 1999 UT 57 at ¶ 18, 993 P.2d 837. The trial judge should determine if the evidence is sufficiently connected to Jackson's state of mind the night of the murder.

## CONCLUSION

¶ 31 We hold that the trial court erred by failing to instruct the jury on both extreme-emotional-distress and imperfect-legal-justification manslaughter. Accordingly, we reverse and remand for a new trial with jury instructions on both extreme-emotional-distress and imperfect-legal-justification manslaughter. In the new trial, the trial judge must decide if Jackson's prior criminal behavior is relevant to his state of mind the night of the murder.

¶ 32 WE CONCUR: JAMES Z. DAVIS and WILLIAM A. THORNE JR., Judges.